UNITED STATES *v.* KANE and others.

*(Circuit Court, D. Colorado. 1885.)*

1. RECEIVERS—INTERFERENCE OF STRIKERS—INDUCING EMPLOYES TO LEAVE SERVICE—CONTEMPT.

Where employes of a railroad company that is in the hands of a receiver appointed by the court, are dissatisfied with the wages paid by the receiver, they may abandon the employment, and by persuasion or argument induce other employes to do the same; but if they resort to threats or violence to induce the others to leave, or accomplish their purpose, *without actual violence,* by overawing the others by preconcerted demonstrations of force, and thus prevent the receiver from operating the road, they are guilty of a contempt of court, and may be punished for their unlawful acts.

2. SAME—CONSPIRACY TO DO UNLAWFUL ACT—LIABILITY OF ALL FOR ACTS OF INDIVIDUAL CONSPIRATOR.

Where a party of men combine with intent to do an unlawful thing, and in the prosecution of that unlawful intent one of the party goes a step beyond the balance of the party and does acts which the balance do not themselves perform, all are responsible for what the one does. It is essential, however, that there should be a concert of action,—an agreement to do some unlawful thing.

*H. H. Hobson,* U. S. Dist. Atty., and *E. O. Wolcott,* for receiver.

*Ralph Talbot,* for defendants.

BREWER, J., *(orally.)* Now, coming to these contempt cases, the stenographer very kindly copied out all his notes last night and furnished the transcript to me; so I have had an opportunity to read over the testimony, and I have done it very carefully.

I think a few preliminary considerations, in reference to the common rights which we all have as free men in this country, may not be amiss. Every man has a right to work for whom he pleases, and to go where he pleases, and to do what he pleases, providing, in so doing, he does not trespass on the rights of others. And every man who seeks another to work for him has a right to contract with that man, to make such an agreement with him as will be mutually satisfactory; and unless he has made a contract binding him to a stipulated time, he may rightfully say to such employe at any time, "I have no further need of your services."

Now, it is well to come down to simple things. Supposing Mr. Wheeler has a little farm of 20 acres. He comes to Mr. Orr and says to him, "Here, work for me, will you?" and Mr. Orr goes to work for him under some contract. Now, every one of us realizes the fact that if Mr. Orr is tired of working there, if he does not think the pay is satisfactory, or if it is a mere whim of his, he has a right to say, "Mr. Wheeler, I won't work for you any more," and Mr. Wheeler would have no right to do anything. Mr. Orr is a free man, and can work for whom he pleases, and as long as he pleases, and quit when he pleases; and that right which Mr. Orr has Mr. Wheeler has also. The fact that Mr. Wheeler happens to be an employer does not abridge his freedom. If he is tired of Mr. Orr's work, or if he dislikes the man, or if he does not want any more of his assistance on his

place, he can say to Mr. Orr, and say very properly, "I have paid you for all the time you have worked; now you can leave, and seek work elsewhere." Those are common, every-day, simple rules of right and wrong we all recognize. Nobody doubts that. Nobody would think for a moment, in a simple case of that kind, of questioning the right, either of Mr. Orr to quit or of Mr. Wheeler to say, "You may leave." And that which is true in these simple matters where there is a little piece of property, and a single owner and a single laborer, is just as true when there is a large property, a large number of employes, and a corporation is the owner. Rules of right and wrong, obligations of employer and obligations of employe, do not change because the property is in the one instance a little bit of real estate, and in the other a large railroad property; and if we apply these simple, commonplace rules of right and wrong, we avoid, oftentimes, a great many of the troubles into which we come.

Moving on a little further to another matter. Supposing Mr. Wheeler had two men employed, and that he finds that in the management of his little farm he is not making enough so that he can afford to employ two laborers, and he says to one of them: "I will have to get along without your services, and I will do with the services of the other," and the one leaves. That is all right. Supposing the one that leaves goes to the one who has not left and says to him: "Now, look here; leave with me,"—giving whatever reasons he sees fit, whatever reasons he can adduce,—and the other one says: "Well, I will leave," and he leaves because his co-laborer has persuaded him to leave,—has urged him to leave; that is all right. Mr. Wheeler has nothing to say; he may think that the reasons which the one that is leaving has given to the one that he would like to have stay are frivolous, not such as ought to induce him to leave; but that is those gentlemen's business. If the one whom he would like to have stay is inclined to go because his friend has urged him, has persuaded him, has induced him to leave, Mr. Wheeler cannot say anything. That is the right of both these men,—the one to make suggestions, give reasons, and the other to listen to them, and act upon them.

But supposing—and I will take the illustration that I partially suggested yesterday—supposing one is discharged and the other wants to stay, is satisfied with the employment; and the one that leaves goes around to a number of friends and gathers them, and they come around, a large party of them,—as I suggested yesterday, a party with revolvers and muskets,—and the one that leaves comes to the one that wants to stay and says to him: "Now, my friends are here; you had better leave; I request you to leave;" the man looks at the party that is standing there; there is nothing but a simple request,—that is, so far as the language which is used; there is no threat; but it is a request backed by a demonstration of force, a demonstration intended to intimidate, calculated to intimidate, and the man says: "Well, I would like to stay, I am willing to work here, yet there are too many

men here, there is too much of a demonstration; I am afraid to stay." Now, the common sense of every man tells him that that is not a mere request,—tells him that while the language used may be very polite and be merely in the form of a request, yet it is accompanied with that backing of force intended as a demonstration and calculated to make an impression; and that the man leaves, really because he is intimidated.

If I take another illustration I will make it even more plain. Supposing half a dozen men stop a coach, with revolvers in their hands, and one man asks the passengers politely to step out and pass over their valuables; and they step out and pass over their valuables; and supposing those men should be put on trial before any court for robbery, would not you despise a judge that would say, "Why, there was no violence; there were no threats; there was simply a request to these passengers to hand over their valuables, and they handed them over; it was simply a request and a loan of their valuables?" Would not the common sense of every man say that that request, no matter how politely it was expressed, was a request backed by a demonstration of force that was really intimidation, and made the offense robbery? Would not you expect any judge to say that? Would not you despise any one that would say otherwise? And so, as I suggested yesterday to my brother TALBOT,—and he has argued his case with very great clearness,—that is really the question here : whether these parties went there simply, as persons have a right to do, to request engineers and train-men to desist from further labor, or whether they went there, under the circumstances, with such a demonstration of force, with such an attitude and an air, that although nothing but a request was expressed, it was a request which men did not dare decline to comply with. The fact that half a dozen men went there and asked an engineer, or a brakeman, or a train-man to quit,—that is all right, if it was simply a mere matter of request, a mere matter of giving views and reasons. That is a part of the common right of us all. We all can express our opinions. We can go to any friend and urge him to do this or do that; that it is a part of the common liberties of every man in this country; and the question is not, whether these gentlemen went there in a pleasant way and stated reasons, or urged their friends to quit work, but, did they go with such an intended demonstration of power, and in such an attitude, that though, as they have stated here, they simply requested these engineers and employes to quit, they did it under circumstance that the engineers and the train-men were intimidated, and quit because they felt compelled to. I do not suppose that the court would be concluded by the mere statement of an engineer that he was afraid, because that might have been simply an excuse for his conduct, or it might have been because he was a timid man, and there was really no such demonstration that a sensible man, an ordinary man, a prudent and fair-minded man, had any reason to expect any further trouble.

So, before the government can properly ask the court to treat these defendants as in contempt, it must satisfy the court that these requests were, in fact, something more than mere requests; that whatever language may have been used, it was used under such circumstances and with such demonstrations that the employes, the engineers, and the train-men felt that, as prudent men, they must leave; that, because of due regard for their own safety and their own well-being, they had to leave; and also that that demonstration was made under the circumstances with the intent to accomplish that result. If that is shown, if the testimony makes it clear that those parties went in such numbers, and conducted themselves in such a way, that while they simply said, "Please get off this engine," or "We want you to get off this engine," they intended to overawe,—intended, by the demonstrations which they made, to impress upon the minds of the engineers and train-men that personal prudence compelled them to leave,—why, then the government has made out its case. It is not necessary that there should be actual violence. As my brother TREAT said in a similar case, (*In re Doolittle, ante,* 544,) that we had before us in St. Louis, a request, under these circumstances, is a threat. Every sensible man knows what it means, and courts are bound to look at things just as they are, to pass on facts just as they are developed, to treat the conduct of men just as it is, and to impute to them that intention which their acts and their conduct disclose was their intention.

Then there is another proposition that comes in,—a familiar rule of law,—that where a party of men combine, with the intent to do an unlawful thing, and in the prosecution of that unlawful intent one of the party goes a step beyond the balance of the party, and does acts which the balance do not themselves perform, all are responsible for what the one does. In order to make that rule of law applicable, there must be a concert of action; an agreement to do some unlawful thing. If there is no such agreement, no such preconcert of action, why then each individual is responsible simply for what he does. Thus, for instance, if there should happen to gather here on the street 50 or 100 or 200 men, with no preconcert of purpose, accidentally meeting here, and a street fight should develop in their midst, all of that crowd are not responsible for it; that would be unjust; that would be unfair; because they did not go there, they did not meet together, with a preconcerted purpose to do anything unlawful, and, although something unlawful may be done in that crowd, yet only they are at fault who do the unlawful thing. But if they all met, as I said, for the purpose of doing some unlawful act, having formed beforehand the purpose to do it, and are present there to carry that purpose into effect, then every man, by virtue of uniting in that preconceived purpose to do the unlawful thing, makes himself responsible for what any one does.

A familiar illustration which often comes before a court is this: Supposing three or four men form a purpose to commit burglary, and

break into a house for the purpose of committing that burglary; that is all they had intended to do; that is the unlawful act, and the single unlawful act, which they had set out to accomplish; they get into the house and somebody wakes up, and one of the party shoots and kills. Now, the three or four persons who went into that house never formed beforehand the intent to kill anybody; they simply went in there to commit burglary; but; combining to do that unlawful thing, in the prosecution of that burglary, and to make it successful, one of the party shoots and kills, and the law comes in and says: "All of you are guilty of murder; we do not discriminate between you; you broke into that house to commit burglary; in the prosecution of that burglarious entrance one of your party committed murder; all are guilty."

Now that is a reasonable rule, when you stop to think of it; it is not a mere harsh, arbitrary, technical rule which the courts have laid down, and the statutes have established; it is a rule intended to prevent combinations or conspiracies to do an unlawful thing, and where there are many together it is often difficult to distinguish the one who does any particular act. I have a very forcible illustration right in this testimony before me. Mr. Tyler is charged by one or two witnesses with having said, in one of those interviews with one of the engineers, after some colloquy, and a man saying he was not afraid to take that engine and train out, "What about the after-clap?" Now Mr. Orr comes forward and says, and Mr. Tyler too, that Mr. Tyler did not use that expression. Mr. Orr said he heard the remark, but it was a remark from some one at his right, and was not made by Mr. Tyler. That will often be true where there are many together; in the excitement which attends such a gathering, it is often very difficult to individualize the particular actor or speaker, and while one witness may say this man did it or this man said it, another witness equally credible, and present at the time, may have it in his mind that another man did or said it. So, because it is often in the nature of things difficult to individualize a man that does or says a particular matter, the rule is laid down that if they have met with a preconceived purpose to do an unlawful act, all must respond for what each one does and says. That is, as I said, no harsh and arbitrary rule, but a rule in the interests of justice, for the protection of society.

Now, with these preliminary observations, let us come down to the testimony itself. All parties, the defendants and the witnesses for the government, agree that there was a large gathering there,—quite a crowd; and, as Mr. Orr says, there was a "fever of excitement." He used the expression once, "It was the rage;" interpreting that afterwards with the idea that there was an excitement pervading the crowd, which surged backwards and forwards, now to this engine and now to that, and that there was an excited, eager crowd of people there, bent on accomplishing a certain result. They wanted to stop the movement of trains; they did not seek to destroy an engine; they

did not seek to destroy property; they had obviously that respect for the rights of property which made them unwilling to touch an engine, a car, or any of the property of the company for the sake of destroying it; and in that they are to be commended; in that their conduct differs from that which oftentimes is found in movements of this kind; for it is part of the public history of the country, as we all know, that, in what are called strikes, excited men, wicked men, have wrought oftentimes fearful destruction of property.

You will all remember the Pittsburgh riots, years ago, when millions of dollars of property were destroyed. These men, and I say it to their commendation, I do not see from the testimony that they put a finger on a dollar's worth of company's property to destroy it; but they did go there with the intent to prevent this company, whose property is in the hands of the court, from moving its trains,—from attending to its regular business. Of that there can be no question. What the grievances were, what the reasons for the strike were, are obscure. I do not fully understand them. The parties defendant in this case, when they were on the stand themselves, did not seem to have a definite idea of the wrongs that they complained of, or of what their grievances were. If they had any grievances, if there was anything of which they had a right to complain, it is one of the peculiar features of property situated as this is that the court is always open to hear and adjust them; and in one respect this company, whose property is in the hands of the court, has not the freedom which ordinary property owners have. Although owning this railroad, it is not for it to say who shall be employed and who not. The court has taken possession of that property, and any man connected with the administration or management of that road, I do not care who he is, whether he is doing the most humble, common work on the line of that road, has the same right that the receiver himself has, that any creditor of the road has, to come into this court and insist that any grievance which he has against the management of that road shall be considered and passed upon. Ordinarily, you know, when a company has property, it has absolute liberty. It may dismiss whom it pleases, and employ whom it pleases; but when the courts take possession of property in this way, that liberty is abridged, and the company cannot say,—Mr. Jackson, the receiver, cannot say,—"I will discharge all of these men; I will pay them only so much a day; I will require so many hours' work; I will require this and that of them;" for there is no one in the employ of the company but who has the right to come and say to this court, "Mr. Jackson is making an unreasonable requirement; it is more than he has fairly and reasonably a right to require of us;" and the court is bound to listen to that complaint, and to see that justice is done between the receiver and any employe. But this party of strikers, not coming into this court, assumed at that time to try to stop the operation of the road; tried to prevent the engineers from running out the

v.23ꜰ,no.15—48

trains; tried to prevent the train-men from working; and while, as I say, they touched no property to injure it, yet I think there was no one that heard the testimony but felt that that demonstration was made with the intent to overawe these engineers; to make them feel that it was not personally prudent to run those trains; that there was a risk to themselves in attempting to continue the operations of the road there; and that these engineers acted under a reasonable sense of personal danger accruing from the demonstration that was made in their presence.

I have no doubt that some men, who are excessively bold, might have laughed at it, and waited, believing that no personal violence would be used; but men are not all equally bold and courageous; the average man has a feeling that it is his duty to regard his personal safety; we all know that, and we act upon that presumption; and when these men met there in that fever of excitement, when the crowd surged backwards and forwards, from one end of that yard to the other, approaching now this engine and now that, they knew, and every man knows, that that kind of a demonstration was calculated to intimidate; and they knew, and every man knows, that ordinarily prudent men are not going to risk their personal safety when there is nothing to be gained by it. They are going to say, "Well, here is a crowd; they are in excitement here; they pass backwards and forwards through this yard; and though they say we cannot do any violence, we cannot order you to leave, but you had better leave; we request you to leave; you are not going back on us, and we had better quit." Every one understands that these men felt overawed, intimidated, and quit work, not because they wanted to,—some of them, at least,—but because they felt that their personal safety, personal prudence, required them to do it. It would be, as it seems to me, blinding my eyes to obvious facts to say that there was not intimidation. I think these men that were there would themselves feel that I did not respect their good sense, that I did not give them credit for ordinary intelligence, if I should say that that was a mere peaceable gathering of a few men to present a request; and I have come reluctantly to the conclusion that there was an effort, a preconcerted effort, at that time, by a demonstration of force, to overawe these engineers and train-men, and to prevent the receiver from operating the road there.

Coming to that conclusion, there is but one duty that a court may discharge. Courts are organized for the protection of persons and property, and while in the discharge of their duties oftentimes there are unpleasant burdens cast upon them; yet no man is fit to occupy a position as a judge, especially in a court which, like this, has such vast powers and such solemn responsibilities, who can hesitate, whenever a wrong is brought to his attention, to treat it as a wrong and punish accordingly.

I have looked over this testimony to see if I could distinguish in

any way between the conduct of these defendants,—if I could find who were, in the language of some of the witnesses, the ringleaders, the ones that were urging on the others; for it is part of our common knowledge that in movements of this kind the great majority are led by the few; they listen to those who are the leaders. As some of these defendants said, not knowing really what the trouble was, yet because they were led and urged by others, they went into this strike. Now, those who are in the great majority in such a case, who are simply the followers of a few leaders, the court ought to treat very mildly; those who are the ringleaders, those who lead off in any unlawful movement, must expect to be treated as such.

The first one that I shall notice is Mr. Wheeler. For the reasons which I have already indicated, independent of the particular matter which I shall refer to, it seems to me that he must be held responsible with the others. Beyond that is his connection with an engine and cars that went to Poncha, and the setting off of a car there. Mr. Wheeler gives his version of that affair, and, according to that, his thought in what he did was rather to protect the company than otherwise. Well, it is fair to him to give him the benefit of his explanation as to that matter, though I can but think that he must be held responsible generally with the others. But there is a circumstance connected with himself personally which leads me to make a different ruling in his case from the others; certain family matters which I need not mention here, and which seem to justify and require me to treat his case as exceptional. While courts are exacting and sometimes severe, they are never cruel; and, in view of these family matters, Mr. Wheeler will be discharged, on giving his personal recognizance to keep the peace and not interfere with the management of the road by the receiver.

The next case is that of Mr. Murphy. Upon the general considerations that I have given I think that he must be held responsible, and technically, I might say, within the rule of the law heretofore stated, that he must be considered as equally guilty with the others; but as I read the testimony through, notwithstanding one or two matters in which he figured personally, it does not impress me that he can be regarded as a leader, and I shall impose a slight punishment on him. The order will be that he will be committed to the county jail for 10 days.

In respect to Mr. Tyler, I think his conduct shows that he was more of a leader than these other two. I do not see that his conduct was such that he could be called, in the severest sense of the term, one of the leaders. Here was possibly a man who was talking a good deal, yet his conduct does not seem to me to merit the condemnation that Mr. Orr's does, and the order will be in his case that he be committed for 30 days.

In regard to Mr. Orr, he denies one by one, and *in toto*, the specific charges made against him by the several witnesses, or else, where he

admits a part of what was said, he qualifies it by giving his recollection of the conversation. If there were but one witness who made these specific charges against him,—as he appeared very frank in his manner on the witness stand, outspoken, straightforward,—I should feel that in his case the duty which exists of giving the benefit of all doubts to a party charged with wrong, would make me place his conduct along-side that of the others; but there are three or four witnesses testifying to separate matters, and it seems to me I should not be doing justice to take his single denial as against the testimony of these several witnesses. It may be, and I think regard for every man requires me to say, that possibly, in the excitement of that day, having made these remarks or threats, they have passed from his mind, and that he really did not intend, on the witness stand, to state anything other than as he remembered; but these witnesses who speak in reference to what threats he made are too specific, too positive, too clear, for me to doubt that on that day he did make the threats which are charged against him, and those threats are of no trifling nature. I cannot pass over such conduct lightly. I do not know what testimony was adduced before my brother HALLETT in reference to the two cases which he disposed of; but where a party is guilty of no actual injury to property, I think a distinction should be drawn between his case and that of parties who forcibly seize and destroy property. I had occasion the other day, in St. Louis, to go through with matters of this kind at great length, where I felt constrained to impose a milder punishment than my brother TREAT, the district judge, thought the cases warranted; and I did it then on the ground that there was no destruction of property, and that, perhaps, in that case, there was no specific intent to interfere with the property in the hands of the receivers. In this case, without intending to say that six months might not be a proper punishment, yet, as the parties did not do any violence to the property, I think that it would be fair to impose a penalty of only four months on Mr. Orr. I do that partially for this further reason,—and, as, perhaps, some of these gentlemen who are in the court-room are interested in this matter, it will not be out of place for me to add a word.

So far as I am advised, this was the first demonstration of the kind along this road, and the parties engaged in it did no violence to property, for which, as I said, they are to be commended. It seems from the testimony that they were trying to accomplish their purposes without any violence to property, and perhaps some—some certainly, and perhaps all—believing that in what they were doing they were not interfering with the property in the hands of the court, or placing themselves in a position where they could be held liable for contempt. It is fair to every man to believe what he says, unless there is developed on the other side such testimony as compels a disregard of his statements. But this case, in all its features, has developed to these men the fact that where property is in the possession of the

court, the management of that property cannot lightly be trifled with, and the lesson it teaches will not, I think, be forgotten. And while the penalties which I have imposed are not so severe as have been imposed in many cases elsewhere, and indeed here, I want to say in conclusion that no subsequent demonstration of a similar nature anywhere within my jurisdiction, or at least within this state, where these cases have transpired, and where others must take notice of what was done, may expect any such light treatment at my hands. It is the duty of the court to see that property which is put into its hands, or in the hands of its receivers, is absolutely protected, and that nobody, directly or indirectly, interferes with the management of that property. No man is bound to stay a single day in the employment of the receiver appointed by this court, and no man must interfere with the property or with the management of that property so long as it is in the hands of the court; and if there is any subsequent demonstration of a similar nature, I want now to say most kindly, but most emphatically, so that nobody may misunderstand, that any parties who are engaged in it and who are brought before me for contempt, must expect the severest penalty which the law permits. If there is any man, as I said awhile ago, who feels that he is wronged in any way by the receivers appointed by this court, all he has to do is to come and make his grievances known, and they will be heard, and the court will try to do justice by him as well as by the receivers; but no violence, in any way, shape, or manner, will be tolerated in the slightest degree.