[L. A. No. 6049. In Bank.—August 4, 1921.]

## SOUTHERN CALIFORNIA IRON AND STEEL COMPANY (a Corporation), Respondent, v. AMALGAMATED ASSOCIATION OF IRON, STEEL AND TIN WORKERS et al., Appellants.

[1] Employer and Employee—Right to Quit.—In the absence of contract, the right of a workman to quit his employment is as absolute as the right of a fellow-employee to remain in the employment, or of another workman to take the place vacated by the one who has quit, or the right of the employer to dispense with an employee's services.

[2] Id.—Right to Induce Others to Quit.—It is lawful for an employee who has quit to peaceably persuade a fellow-employee to leave his position, and if there are a number of employees who have left a common employer, they are within their legal rights if and when they attempt as a group to persuade other employees, who continue to work, to quit, provided there be no force, violence, or intimidation, physical or moral, used, since the mere fact of numbers does not necessarily make such persuasion illegal.

[3] Id.—Unlawful Acts—Injunction.—Where violence, threats, or intimidation are used in an effort to induce another to quit his employment, the acts of an individual or a number of individuals are unlawful and may be enjoined, and it is not necessary to the enjoining of such acts that it be shown there was actual force or expressed threats of physical violence used.

[4] Appeal—Evidence—Scope of Review.—It is not the province of the appellate court to weigh the evidence nor to determine the credibility of the witnesses, but only to decide whether the evidence, as matter of law, supports the findings.

[5] Injunction — Conspiracy of Striking Employees — Injury to Employer's Business—Sufficiency of Evidence.—In this action to enjoin a union and certain of its individual members, who were striking employees of the plaintiff, from picketing plaintiff's place of business, molesting its employees and otherwise interfering with its business, the evidence is held sufficient to support a finding that the defendants had entered into a conspiracy with the design and for the purposes alleged and found.

---

2. What is unlawful interference or intimidation in strikes, note, 61 Am. St. Rep. 706.

Right, in aid of strike, to employ peaceable persuasion to induce persons not under contract to quit, or not accept employment, note, 41 L. R. A. (N. S.) 445.

[6] ID.—ACTS NOT UNLAWFUL—JUDGMENT.—In such an action, the placing of pickets near plaintiff's place of business for a purpose not at all connected with such business, and not for the purpose of intimidating employees of plaintiff, so as to coerce them to quit their employment, nor for the purpose of intimidating persons intending to become employees, so as to prevent them from doing so, cannot appropriately be enjoined, since such an act would not be wrongful as against the plaintiff and would not be calculated to injure the plaintiff's business.

[7] COSTS—APPEAL—MODIFICATION OF JUDGMENT.—Where the obvious purpose of an appeal in an action for an injunction was to obtain a positive reversal, and the judgment was modified but without substantially changing its important features, the appellants cannot recover costs.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frank G. Finlayson, Judge. Modified.

The facts are stated in the opinion of the court.

Paul W. Schenck, James S. Roche and Richard Kittrelle for Appellants.

Barnhill & Pratt and William A. Barnhill for Respondent.

LAWLOR, J.—This is an appeal by the defendants, Amalgamated Association of Iron, Steel and Tin Workers, Golden State Lodge, Local No. 3, et al. (hereinafter referred to as "the union"), and the 102 individual members thereof (hereinafter referred to as "the strikers"), from a judgment in favor of the plaintiff, Southern California Iron and Steel Company, a corporation, in an action to enjoin the defendants from "picketing" plaintiff's place of business, from molesting plaintiff's employees, and from otherwise interfering with plaintiff's business.

Respondent conducts a steel rolling-mill at the corner of Fourth and Mateo Streets, in the city of Los Angeles. The union is an unincorporated association, organized in 1907. Respondent employed a varying number of the members of the union. All of the strikers were employees of respondent

6. Legality of picketing in connection with industrial disputes, notes, 13 Ann. Cas. 60; Ann. Cas. 1918E, 54; 6 A. L. R. 928; 4 L. R. A. (N. S.) 302; 50 L. R. A. (N. S.) 412.

up to November 1, 1917. On that day a meeting of the union was called and it was voted to quit respondent's employment. Accordingly, all of the individual appellants, who, however, did not constitute all of respondent's employees, immediately went on strike. Their places were taken by other men, not members of the union, and to these we shall hereafter refer as "the employees."

Respondent continued to operate its plant under these conditions until the commencement of this action, on or about March 1, 1918. It was alleged that on various occasions after the strike was called the strikers had been seen on the street in front and in the immediate vicinity of respondent's mill, singly and in groups of varying size, and that on those occasions they had engaged in conversation with certain of respondent's employees. Respondent alleges, in effect, that at all times the strikers were instructed by the union thus to visit the neighborhood of the mill in order, by intimidation, threats, and, in certain instances, actual physical violence, to induce respondent's employees to leave their employment; that, in carrying out these instructions, the strikers did threaten, menace, molest, and intimidate certain of the employees, so that a number of them were induced, through fear of personal violence at the hands of the strikers, to quit respondent's employ; and that, by reason of such acts on the part of both union and strikers, respondent has been greatly hindered and damaged in the conduct of its business.

The court made findings of fact and conclusions of law. The judgment is a permanent injunction restraining both the union and the strikers from interfering with the use by respondent of its property; hindering, in the manner set forth, the respondent's business; molesting, intimidating, or harassing, using any force against, or applying vile names or language of ridicule or contempt toward any employee of respondent or person seeking to enter its employ; placing pickets near respondent's place of business to induce persons to quit respondent's employ or refrain from entering it, or for any other purpose; and from going to the homes of any employees of respondent to intimidate or threaten them, or to intimidate any member of their families for the purpose of inducing them to pursuade the employees to quit respondent's employ.

Appellants contend "that the evidence in this case is insufficient to sustain any of the material findings as found by the trial court." Respondent insists "That the findings have ample evidence to sustain a conspiracy and the acts done in furtherance thereof."

We shall first consider the law on this general subject as laid down in numerous authorities. The leading case in the United States is *United States* v. *Kane*, 23 Fed. 748. There the defendants had quit the employ of the Denver and Rio Grande Railroad, and the road was suing to enjoin them from interfering with the operation of its line. Mr. Justice Brewer, in that case, said:

"I think a few preliminary considerations, in reference to the common rights which we all have as free men in this country, may not be amiss. Every man has a right to work for whom he pleases, and to go where he pleases, and to do what he pleases, providing, in so doing, he does not trespass on the rights of others. And every man who seeks another to work for him has a right to contract with that man, to make such an agreement with him as will be mutually satisfactory; and unless he has made a contract binding him to a stipulated time, he may rightfully say to such employee at any time, 'I have no further need of your services.' . . .

"Supposing Mr. Wheeler had two men employed. . . . But supposing . . . one is discharged and the other wants to stay, is satisfied with the employment; and the one that leaves goes around to a number of friends and gathers them, and they come around, a large party of them,—as I suggested yesterday, a party with revolvers and muskets,— and the one that leaves comes to the one that wants to stay and says to him: 'Now, my friends are here; you had better leave; I request you to leave'; the man looks at the party that is standing there; there is nothing but a simple request, —that is, so far as the language which is used; there is no threat; but it is a request backed by a demonstration of force, a demonstration intended to intimidate, calculated to intimidate, and the man says: 'Well, I would like to stay, I am willing to work here, yet there are too many men here, there is too much of a demonstration; I am afraid to stay.' Now, the common sense of every man tells him that that is not a mere request,—tells him that while the language used may be very polite and be merely in the form of a

request, yet it is accompanied with that backing of force intended as a demonstration and calculated to make an impression; and that the man leaves; really because he is intimidated. . . .

"That is really the question here: whether these parties went there simply, as persons have a right to do, to request engineers and train-men to desist from further labor, or whether they went there, under the circumstances, with such a demonstration of force, with such an attitude and an air, that although nothing but a request was expressed, it was a request which men did not dare decline to comply with. The fact that half a dozen men went there and asked an engineer, or a brakeman, or a train-man to quit,— that is all right, if it was simply a mere matter of request, a mere matter of giving views and reasons. That is part of the common right of us all. We all can express our opinions. We can go to any friend and urge him to do this or do that; that is a part of the common liberties of every man in this country; and the question is not, whether these gentlemen went there in a pleasant way and stated reasons, or urged their friends to quit work, but, did they go with such an intended demonstration of power, and in such an attitude, that though, as they have stated here, they simply requested these engineers and employees to quit, they did it under circumstance that the engineers and the train-men were intimidated, and quit because they felt compelled to. . . .

"Then there is another proposition that comes in,—a familiar rule of law,—that where a party of men combine, with the intent to do an unlawful thing, and in the prosecution of that unlawful intent one of the party goes a step beyond the balance of the party, and does acts which the balance do not themselves perform, all are responsible for what the one does. In order to make that rule of law applicable, there must be a concert of action; an agreement to do some unlawful thing. If there is no such agreement, no such preconcert of action, why then each individual is responsible simply for what he does. Thus, for instance, if there should happen to gather here on the street fifty or one hundred or two hundred men, with no preconcert of purpose, accidentally meeting here, and a street fight should develop in their midst, all of that crowd are not

responsible for it; that would be unjust; that would be unfair; because they did not go there, they did not meet together, with a preconcerted purpose to do anything unlawful, and, although something unlawful may be done in that crowd, yet only they are at fault who do the unlawful thing. But if they all met, as I said, for the purpose of doing some unlawful act, having formed beforehand the purpose to do it, and are present there to carry that purpose into effect, then every man, by virtue of uniting in that preconceived purpose to do the unlawful thing, makes himself responsible for what anyone does.''

The liability of co-conspirators is thus defined in 12 Corpus Juris, 610: ''Where two or more persons enter into a conspiracy, any act done by either in furtherance of the common design and in accordance with the general plan becomes the act of all, and each conspirator is responsible for such act. This is true even though the results were not specifically intended or the means specifically agreed on.'' (See, also, *People* v. *Schmidt*, 33 Cal. App. 426, 445, [165 Pac. 555].)

In *Jordahl* v. *Hayda*, 1 Cal. App. 696, [82 Pac. 1079], the injunction enjoined the establishment of a picket for purposes of an unlawful boycott. The court said: ''Appellants contend that the words used in the findings, such as 'threats,' 'acts of intimidation,' 'interfered with,' 'driven away,' or 'prevented,' as applied to the conduct of the defendants . . . imply force, and that the 'evidence does not warrant a finding that implies that force' was used. We do not think these words . . . imply that it was necessary to show physical force on the part of defendants toward anyone. . . . While the right of free speech is guaranteed to all citizens by the constitution, there is also guaranteed to them by the same constitution the right of 'acquiring, possessing, and protecting property; and possessing and obtaining safety and happiness' (art. I, sec. 1); and it is a maxim of jurisprudence prescribed by the statute law of this state that 'one must so use his rights as not to infringe upon the rights of another.' (Civ. Code, sec. 3514.) These guaranties are equally important to and equally necessary for the protection of all classes of citizens. The difficulty in most cases is to apply the principle governing these correlated rights in particular cases as they arise.''

*Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, [16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550, 98 Pac. 1027], was a case of a strike, a threatened boycott of the employer, and of intimidation and threatened boycott of the non-striking employees. The late Chief Justice Beatty, delivering the opinion of the court, said: "There was no force, threat, violence or intimidation used toward the non-union men . . . There was not at any time any picketing of the plaintiff's premises or interference with its customers . . . There was also some evidence that in three instances individual members of some of the unions had warned some of the strikers that they would incur some danger of personal violence if they returned to work while the plaintiff remained unfair, but these threats were not authorized or countenanced by the council or any of the unions, and not a single act of violence was proved against any one who did return to work. . . .

"A conspiracy is a combination of two or more persons to accomplish by concerted action a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means, and to support the conclusion that these defendants were guilty of a conspiracy it must be held that their purpose was at least unlawful if not criminal, or their purpose being lawful that they proposed to attain it by the employment of some unlawful means.

"Limiting our consideration for the present to this question of conspiracy, it is clear that the avowed object of these organizations—the several unions of workingmen, and the council in which they were combined—was in no sense unlawful, and the discussion may be confined to the question whether the means proposed for its attainment were unlawful . . . " The judgment was reversed on the ground it was not shown that the strikers had used force, violence, threats, or intimidation.

In *Pierce* v. *Stablemen's Union,* 156 Cal. 70, at page 78, [103 Pac. 324, 328], which was a case of striking employees boycotting their former employer by means of threats and intimidation, it was declared: "It is the absolute, unqualified right of every employee, as well as of every other person, to go about his legal business unmolested and unobstructed and free from intimidation, force, or duress. The right of a labor association to strike is no higher than

the right of a non-union workman to take employment in place of the strikers. Under the assurance and shield of the constitution and of the laws, the non-union laborer may go to and from his labor and remain at his place of labor in absolute security from unlawful molestations, and wherever such protection is not fully accorded, not the laws themselves, but their execution is to be blamed. In this country a man's constitutional liberty means far more than his mere personal freedom. It means that, among other rights, his is the right to freely labor and to own the fruits of his toil. (*Ex parte Jentzsch*, 112 Cal. 468, [32 L. R. A. 664, 44 Pac. 803].) Any act of boycotting, therefore, which tends to impair this constitutional right freely to labor, by means passing beyond moral suasion, and playing by intimidation upon the physical fears, is unlawful." (See, also, *Goldberg etc. Co.* v. *Stablemen's Union*, 149 Cal. 429, [117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460, 86 Pac. 806]; *Berger* v. *Superior Court*, 175 Cal. 719, [167 Pac. 143]; *Rosenberg* v. *Retail Clerks' Assn.*, 39 Cal. App. 67, [177 Pac. 864]; *Moore* v. *Cooks' etc. Union*, 39 Cal. App. 538, [179 Pac. 417]; *American Steel & Wire Co.* v. *Wire Drawers' etc. Unions*, 90 Fed. 608; *Union Pacific R. R. Co.* v. *Ruef*, 120 Fed. 102; *Atchison, Topeka & S. F. Ry. Co.* v. *Gee*, 139 Fed. 582; *Kolley* v. *Robinson*, 187 Fed. 415, [109 C. C. A. 247]; *Franklin Union* v. *People*, 220 Ill. 355, [110 Am. St. Rep. 248, 4 L. R. A. (N. S.) 1001, 77 N. E. 176]; 4 L. R. A. (N. S.) 302, note.)

We quote from Martin on Labor Unions, page 229: "The use of force and violence is not necessary to make picketing unlawful. Intimidation is not limited to threats of violence or to physical injury to person or property. It has a broader signification, and there may also be a moral intimidation which is illegal. In the guise of picketing strikers may obstruct and annoy others and by insult and menacing attitude intimidate them as effectually as by physical assault."

[1] From the foregoing authorities these principles may be deduced: In the absence of contract, the right of a workman to quit his employment is as absolute as the right of a fellow-employee to remain in the employment, or of another workman to take the place vacated by the one who has quit, or the right of the employer to dispense with an

employee's services.   [2]   Furthermore, it is lawful for the employee who has quit to peaceably persuade a fellow-employee to leave his position.   Moreover, if there are a number of employees who have left a common employer, they are within their legal rights if and when they attempt as a group to persuade other employees, who continue to work, to quit, provided there be no force, violence, or intimidation, physical or moral, used—that is, the mere fact of numbers does not necessarily make such persuasion illegal.   [3] But where violence, threats, or intimidation are used in an effort to induce another to quit his employment, then the acts of an individual or a number of individuals are unlawful and may be enjoined.   However, it is not necessary to the enjoining of such acts, that it be shown there was actual force or expressed threats of physical violence used. It was said in *Allis-Chalmers Co.* v. *Iron Molders Union,* 150 Fed. 155, 173, that "intimidation includes persuasion by or on behalf of a combination of persons, resulting in coercion of the will from the mere force of numbers."   The same rule is thus stated in Martin on Labor Unions, *supra:* "Even a simple 'request' to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimation, with a design to hinder or obstruct workmen, is unlawful intimidation, and not less obnoxious than the use of physical force for the same purpose."

It was found in substance that between the middle of November, 1917, and the date of the commencement of this action, the union and the strikers entered into a conspiracy with the object of compelling respondent to unionize its plant and to grant certain other of appellants' demands; that in furtherance of this conspiracy appellants entered upon "a course of harassing conduct" toward respondent and respondent's employees; that appellants have stationed pickets in the vicinity of respondent's plant "for the purpose not only of inducing but intimidating the employees of plaintiff's plant to quit the plaintiff's service"; that the pickets were stationed "singly and in bunches and groups of from two to eight, and on several occasions in several different groups"; that the strikers "on several occasions used force and violence toward certain employees of the plaintiff corporation, and on numerous occasions since that time have

followed various employees of said plaintiff corporation as the said employees were going to and returning from their work for the plaintiff in an endeavor to get the said employees to quit working for the said plaintiff, and in some instances have threatened said employees in an angry and threatening manner, and used threats and intimidation against the said employees, and have . . . gone to the homes of several of the employees of plaintiff corporation and intimidated and frightened the wives of certain employees . . . and tried to get the said wives to induce their respective husbands to quit working . . . , and have . . . carried on a course of conduct which has made the plaintiff feel that injury would come to the lives and limbs of its employees at said plant''; that, in order for respondent to fulfill its obligations under ''a number of contracts entered into between itself and other persons,'' it has been necessary ''that plaintiff's plant should be run at full capacity''; that a high degree of technical skill was required of respondent's employees; that, because of the scarcity of skilled labor due to the war, it was difficult for respondent to secure and keep a sufficient number of competent employees to keep its plant running at full capacity; that ever since the middle of December, 1917, respondent has had a sufficient number of skilled employees; that appellants ''threaten to continue the commission of the acts hereinafter set forth to the great and irreparable injury of the plaintiff''; and that respondent had no adequate remedy at law.

We turn, now, to a discussion of the evidence. C. C. Peterson, secretary of the union, testified that some time prior to the strike the union ''adopted a scale of wages the same as prevailed in other coast mills, and then we endeavored to have a meeting with Mr. Stephens, the plaintiff's superintendent, . . . but he wouldn't listen''; that subsequently the union and its members agreed to continue to work until certain improvements had been installed in the mill; that on Monday, October 29, 1917, two men, Wilcox and Harris, both recently initiated members of the union, were discharged; that on the same day Stephens told appellant Dave McMills to go home because he was drunk; that forthwith a committee from the union visited Stephens and remonstrated with him for discharging McMills, but

that Stephens refused to reinstate him; that on October 31st appellant Ed Hefferline was discharged; that the union committee, headed by the witness, immediately called on Stephens and demanded that Hefferline be reinstated in his job, which, it seems, was that of foreman of the "continuous furnace," but that Stephens refused so to do and discharged the witness; that on the next day, November 1st, a meeting of the union was held, at which "a one hundred per cent vote" was taken in favor of a strike, and that the individual appellants immediately quit work; that at this meeting a motion was made and carried to the effect that any striker "caught loitering about the mill would be fined five dollars"; that at no time were any instructions given by the union to the strikers regarding the conduct of the strike, "except that nearly every meeting the president admonished the men to behave themselves; . . . he never did tell them to go down and stand on the street corner"; that about two weeks after the strike began appellants discovered respondent had been "misrepresenting things" as to the cause and purpose of the strike and the amount of "government work" on hand in the mill; that at that time the rule that loiterers should be liable to a five dollar fine was repealed. "Some of our members were requested by us to go down to the plant . . . and see the employees . . . and tell them our side of the story," and a motion was made "withholding strike benefits from any man who did not come four times a week" to interview employees at the mill; that he himself was frequently in the vicinity of the plant from that time on; that it was understood among the strikers that no "rough stuff" was to be used—"under no circumstances were we to be anything but gentlemen"; that he could not remember all of the strikers he had seen in the vicinity of respondent's plant, but did name thirty-three of them; that the strikers "were told not to bunch or anything like that"; that "there was nothing said at any meeting . . . with reference to trying to get any employee . . . to quit. We simply told them our side of the story, and if they were men they would quit"; that he always approached any employee in this manner: "Beg pardon, brother, can I speak to you?" that of those employees to whom he had spoken at the mill, about twelve quit; that after November 15th the strikers used to visit

the homes of various employees in order to present "the union's side of the controversy"; and that he himself, with appellants Reeves, Moses, William Kilpatrick, and several others, with that object in view, had visited the home of A. C. Nolte, an employee, in order to talk to the latter's wife; and that the only ones who quit work on November 1st were the members of the union. On cross-examination the witness stated the strikers "always made it a point to keep separated and stand in different places"; and that his purpose in talking to respondent's employees "was to have the members of the union get back their jobs on the same terms prevailing in the other coast mills."

Peterson's testimony was corroborated by appellant Carl D. Steele, corresponding secretary of the union, who further testified that on various occasions he had reported to the union that he had talked with employees; that he never saw more than six strikers in the vicinity of the mill; and that, while he had "no intention or desire to injure or damage" respondent, he "thought that, if I talked to plaintiff's employees . . . they would quit under those conditions."

It was stipulated that Peterson's testimony "should stand as a criterion" of the testimony of each of the thirty-three strikers whom he testified he had seen in the neighborhood of the mill talking to employees.

Abram C. Denman, respondent's president and general manager, testified that respondent supplied iron and steel materials to the allies and to various domestic firms; that between November 1st and December 1st the plant could not be run at more than "a fifty per cent capacity" because he was "unable to acquire a full crew of laborers to take the place of the strikers"; that since November 1st it would have been necessary to "keep our plant running at full capacity in order to fill all of our contracts"; that since November 1st it had been very difficult to secure skilled labor; that he had seen some of the strikers every day since the strike began, near the gate of the plant, gathering in bunches and talking to employees; that he had seen certain of the strikers—whose names he did not know—shaking their fingers at employees and, in one instance, pulling an employee by his overcoat; that, outside of the last-mentioned case, he had not seen and did not "know of a single, solitary act of violence"; that "the delay in installing new

improvements is partly the cause for the delay in getting out some of our work—some of the delay was caused by some of our men who were not as skilled or as familiar with our plant as our old employees''; and that the only orders in which respondent was "behind" were those of one domestic firm.

L. H. Bristol, "efficiency man" for respondent, testified that every day since November 1st he had seen strikers "in and around the plant—never less than eight of them"; that he frequently saw them stop employees, detain them, holding them by the coat, surround them, talking to them "with loud voices and in an angry manner and with gestures"; that on one occasion he saw appellant Ray Hill and three Armenians surround Ogonesoff, an employee, "catch hold of his overcoat," and shake their fists at him, and that "the times when I have seen the strikers gesticulating, menacing and threatening employees of the plaintiff have been so numerous I haven't kept track of any of the dates, other than as I have testified; it occurred practically every day since I was watching the strike."

G. B. Stephens, the superintendent, and W. G. Stidson, respondent's time-keeper, corroborated Bristol's testimony. Stidson also named fourteen employees who, he said, had told him they were afraid of the strikers and quit. James F. Holvey testified that when the strike began he was not a member of the union and continued at work, but that since that time he had quit and joined ·the union. An affidavit given by him on January 7, 1918, before he joined the union, was read to him, in which affidavit he had stated that while he was at work the strikers' attitude toward him was threatening and that they had told him to quit. The affidavit of A. C. Nolte was to the effect that he had had a similar experience with the strikers; that on two evenings after the strike began three of the strikers had visited his home in an automobile; that on each of those occasions they had told him they would give him just one week to quit, and that if he did not quit they would force him to do so; that on each occasion their attitude and manner were threatening, and that "by reason of these things affiant has been in fear that they would annoy and harm affiant and his wife."

Thomas W. Collins, a colored employee, testified that he had frequently seen groups of strikers in the vicinity of re-

spondent's plant; that he had been frequently approached by various strikers and asked to "come on out and join us"; that on each of these occasions the striker was "not very pleasant about it"; that about 4 o'clock one morning four strikers called at his home in an automobile and had tried to persuade him to quit; that he had been "afraid they would give me a beating up and would take me some time and whale me good," but that "there never has been a particle of violence offered to me or to anyone else that I know of by any of the defendants." B. H. Duzan, an employee, testified that on one occasion appellant Peterson had approached him as he was leaving the mill and had asked him in a tone which the witness "couldn't call a friendly manner" if he didn't think "the fellow who takes another man's job is a scab." John M. Nasian, an employee, testified that on January 4, 1918, one Manoogoff, a striker, had threatened to kill him and had only been prevented from hitting him by two other strikers. Charles Ybarra testified that he had gone to respondent's mill to apply for a job, but had not made any application because Paul Gehrke, one of the strikers, had told him to stay away and he was afraid of him. Setrak Arekeloff, an employee, testified that on two occasions a group of strikers had visited his home in the evening and had told him that if he continues in respondent's employ "we will lick you." Hambak Kevorkoff, an employee, testified that Sam Miskinoff, a striker, had struck him in the face on one occasion when they had met in the vicinity of respondent's mill. John Sarkisoff, an employee, testified that appellant Ray Hill had threatened to cut his throat. Yervant Nalbantian, an employee, testified that on one occasion, in the Armenian Cafe, Manoogoff, one of the strikers, had hit him and knocked him down, and that at another time the same man had told him that if he went to work the strikers would harm him. L. Kolesnikoff, an employee, testified that Mike-Avakoff, one of the strikers, had told him, "If you come to work, I kill you." George H. Pettingill, respondent's assistant superintendent, testified that "two or three times" he had seen groups of seven strikers standing on the street in the vicinity of respondent's mill. H. S. Debinden, Charles W. Ryder, John Anderson, Garfield Parsons, L. L. Willfong, and F. V. Marquez, all employees, testified that the strikers had not threatened them, although

Marquez stated that two other employees had quit, telling him that their reason was they were afraid of the strikers. A. H. Swennerton, an employee, testified that appellant C. C. Johnson had told him he (the witness) would be branded as a "scab" and "blacklisted" if he did not quit. Ross S. Mitchell, an employee, stated that toward him the strikers' attitude was "not very friendly."

Mrs. A. H. Swennerton and Mrs. Nolte testified that "since the middle of November" groups of strikers had twice called at each of their homes and told their husbands to quit work, and that they were greatly frightened when the strikers called their husbands "scabs."

All of the above testimony was admitted on behalf of the respondent and is fairly representative of all its evidence. On behalf of the appellants, thirteen of the strikers denied that any of them had ever threatened, intimidated, or committed any acts of violence toward respondent's employees. Each of them stated he had never asked any employee to quit—"it was up to them to quit." Thirteen policemen, each of whom at various times since the strike had been stationed in the vicinity of the mill, testified that while they had seen groups of strikers accosting employees they had never seen, as one of them put it, "anything unseemly or any wrong act on the part of anyone."

[4] It is not our province to weigh the evidence nor to determine the credibility of the witnesses, but only to decide whether the evidence, as matter of law, supports the findings. [5] We think it clear from the foregoing summary of the evidence that the trial court could have found that the union and its members entered into a "combination, confederation, and conspiracy" with the design and for the purposes alleged and found. It is uncontroverted that the strike itself was the result of "a one hundred per cent vote" of the union. As to whether the union authorized the strikers to visit the neighborhood of respondent's mill, Peterson stated that a number of them were "requested" by the union to "go down to the plant and see the employees," and that a motion was made to withhold strike benefits from any man who failed to comply with this "request." Steele and each of the other strikers stated that they had been instructed by the union to frequent the vicinity of the plant and approach the employees, and that they thought that by talking to them

they would quit respondent's employment; but even if it is assumed that this was the true object, there was an abundance of evidence that in carrying out the plan the strikers used unlawful means, and this evidence amply supports the findings of threats and intimidation.   As to the responsibility of the union and all its members for the acts of individual strikers, it has been shown that the strike itself was authorized and directed by the vote of the union, and that at a subsequent meeting it was voted to direct the strikers to visit the vicinity of the plant in order to persuade the employees to quit.   If the acts of the strikers in congregating around the respondent's mill were unlawful, under the rule governing the liability of co-conspirators, each of the strikers, "by virtue of uniting in that preconceived purpose, makes himself responsible for what anyone does."   (*United States* v. *Kane,* 23 Fed. 748.)

It is true the strikers stated that they did not intend to threaten or intimidate the employees, and Peterson testified that they had been cautioned not to gather in groups or act otherwise than "in a gentlemanly manner."   It appears, however, from the testimony of Denman, Stephens, and Bristol that they had seen various strikers standing in groups in the vicinity of the mill acting in a threatening manner and using opprobrious language.   Moreover, there is the testimony of Stidson that fourteen employees had stated to him that they would not continue in respondent's employ because they were afraid of the strikers.   In addition to the happenings around the mill, there is the evidence of acts of intimidation committed away from the works—going to the homes of the employees—the assault on Yervant Nalbantian and the threat to harm him if he went to work.   As was said in *United States* v. *Kane,* *supra,* even conceding that strikers used no language and committed no acts calculated to coerce or intimidate the employees, nevertheless if, at the time the employees were being "politely" requested to leave respondent's service, there were strikers present in numbers sufficient reasonably to inspire a feeling of fear in the employees, then the acts of the strikers in so doing were unlawful.

Appellants make numerous specifications of insufficiency of evidence, but in view of what we have already said concerning the proof it is not necessary to discuss them.   And for

the same reason appellants' motion for nonsuit must be held to have been properly denied.

[6] The *judgment* as entered, however, is too broad in its terms, in that it purports to prohibit acts which may or may not be unlawful, according to the purpose for which they are done, and it does not clearly couple the acts with the unlawful purpose. Thus, for example, the placing of pickets near respondent's place of business for a purpose not at all connected with said business and not for the purpose of intimidating employees of respondent, so as to coerce them to quit that employment, nor for the purpose of intimidating persons intending to become employees of respondent, so as to prevent them from doing so, could not appropriately be enjoined, since such an act would not be wrongful *as against* the respondent and would not be calculated to injure the respondent's business. The judgment is not clearly expressed in other respects, and it is therefore liable to be misunderstood in the enforcement thereof if it should be violated. Consequently, it should be modified in these particulars. This can be done by a direction of this court to the court below to enter a new judgment in a prescribed form. [7] But as the purpose of the appeal obviously was to obtain a positive reversal, and the modifications to be directed do not substantially change the important features of the judgment, the appellants should not recover costs of appeal.

It is ordered that the judgment of the court below be set aside and that on the going down of the *remittitur* that court shall enter a new judgment as follows:

It is therefore ordered, adjudged, and decreed that the defendants Amalgamated Association of Iron, Steel & Tin Workers, Golden State Lodge, Local No. 3, Lester Moses, Charles Boniver, R. Bugundo, George Colvin, A. C. Cole, Gus Phillips, John Phillips, Caspar Russ, E. J. Redden, C. E. Tracy, Ed Hefferline, O. Hayes, Tom Huling, Willard Harn, Wm. Kilpatrick, Jack Masson, Walter Moss, John Donley, Wm. Farr, D. T. Davis, Wm. Davis, Wm. Cumming, O. W. Blom, C. Svensk, John Davis, Geo. B. Willson, Paul Gehreke, Frank Lundberg, Sam Abbott, A. Pilz, C. C. Peterson, Chas. Steele, Ray Hill, Chas. Moss, Riley Delaney, Pete Pogasoff, Sam Soagoff, Anan Kazeroff, Karo Alekoff, Mike Avokoff, Joe Alekoff, John Manoogoff, and each of them be and they are hereby perpetually enjoined and commanded

to desist and refrain from directly or indirectly, or by any means or method doing, or attempting to do, any of the following described acts, with the intent or purpose of intimidating the employees of the plaintiff, so as to prevent them from continuing in said employment, or with the intent or purpose of intimidating persons intending to or about to enter such employment, so as to prevent them from becoming such employees, to wit: Stationing or placing, or causing to be stationed or placed, on the street or elsewhere, at or near the plaintiff's place of business, any picket or pickets; or applying vile names, words of ridicule or contempt, or words calculated to excite fear, to any employee of plaintiff or to any person who may seek to enter such employment; or going singly or collectively to any home of any employee for the purpose of intimidating, molesting, or threatening such employee or any member of his household, or of frightening such members so as to induce them to persuade or try to persuade any employee of plaintiff to quit such employment.

The aforesaid defendants are also enjoined from and commanded to desist and refrain from interfering or attempting to interfere in any manner with the free use, occupation, and enjoyment by the plaintiff, its agents, officers, servants, and employees of any of its property and premises of any kind or nature, or hindering or obstructing or attempting to hinder or obstruct, in any manner, the plaintiff's business or any part thereof; or molesting or interfering with or intimidating or harassing any employee of plaintiff or person who seeks to enter the employment of plaintiff, or using any force or violence of any kind or nature or threatening or attempting to use such force or violence against any employee of plaintiff or any person who seeks such employment, with a design to intimidate or coerce them so as to prevent them from remaining or becoming such employee.

The place of business of the plaintiff referred to consists of the establishment of plaintiff at Fourth and Mateo Streets, in the City of Los Angeles, county of Los Angeles, state of California, and all buildings, structures, equipment, and property of any and every kind thereunto appertaining or belonging, including all automobiles and other personal property used in connection therewith, either at said place of business or in carrying on said business at said place; and the business of the plaintiff referred to in this decree con-

sists of the maintenance and operation of the said establishment and conducting of the business of a steel rolling-mill at said establishment and making and supplying to the trade and to the general market products of iron and steel such as the plaintiff is and has been manufacturing, handling, making, or selling at said establishment.

It is further ordered by the court that the plaintiff recover from the defendants aforesaid its costs in the sum of $475.25.

It is further ordered by this court on appeal that the appellants shall not recover their costs of appeal.

Shaw, J., Angellotti, C. J., Lennon, J., Sloane, J., and Shurtleff, J., concurred.