ATCHISON, T. & S. F. RY. CO. v. GEE et al.

(Circuit Court, S. D. Iowa, E. D. July 10, 1905.)

INJUNCTION—VIOLATION—PICKETING BY STRIKERS.

> The maintenance of a system of picketing by men out of employment by reason either of a strike or lockout, the purpose and effect of which is to annoy and intimidate men working for their former employers by keeping a picket of men around or at the approaches to the places where such workmen are employed, who obstruct the approaches and use threatening or profane and vulgar language toward the workmen, is unlawful, and in violation of the rights of the workmen and their employer, and of an injunction against acts of intimidation toward such workmen, although no actual violence is used. Such picketing, when maintained for a year, cannot be justified on the ground that its purpose is to persuade the workmen to quit their employment or to ascertain who such workmen are.

In Equity. On motion to punish for contempt for violation of injunction.

Thomas R. Morrow, W. S. Hamilton, and Hughes & Sawyer, for plaintiff.

E. C. Webber and John E. Craig, for the accused.

McPHERSON, District Judge. Gus Hult, William Morley, Wm. Randall, and S. C. Neyer, four of the defendants, are before the court charged with being guilty of contempt, in that they have violated the restraining orders of this court. In the spring of 1904, differences arose between the company and some employés in its shops. A strike was threatened or probable, when the company discharged them, and from that time on there has been what by many is called a "lockout." Who is in the right and who is in the wrong as to this has not been the subject of inquiry.

Counsel on both sides agree, as do all informed men, that laboring men have the legal right to strike at will, with or without good reasons, singly, collectively, or as a union; and counsel also agree that the company had the legal right to discharge the men, one, many, or all, at any time, with or without good reasons, and without making the reason known. The rights of both the company and employés as to severing relations were and are reciprocal. The company can discharge employés at will, and employés can quit the company at will. Of course, if the contract of employment is for a fixed time, neither can breach the contract without being liable to a demand for damages; but no such claim has been made by either party, and, if it were, it could not be the subject of inquiry in this, a suit in equity, but would be only cognizable in an action at law for damages. That the employés have the legal right to quit or strike at pleasure, and the company the legal right to discharge at pleasure, simple as the proposition is, is too often forgotten. And that the employés have the legal right to organize and maintain a union is equally simple, but just as often forgotten by many. No court, federal nor state, nor, indeed, any informed man, longer denies the foregoing. And it is equally simple, obvious, and true that when one, many, or all the employés are out, either by

reason of a strike, discharge, or lockout, the positions thus made vacant no longer belong to those once filling them.   But those positions belong to those, and those only, who may be thereafter voluntarily employed by the company.   Those who are out singly, collectively, or by a union or organization, may seek to have the differences adjusted.   This is not only so as a matter of sound reason, but Congress has recognized it as being so by the statutes of June 29, 1886 (Act June 29, 1886, c. 567, 24 Stat. 86 [U. S. Comp. St. 1901, p. 3204]), and June 1, 1898 (Act June 1, 1898, c. 370, 30 Stat. 424 [U. S. Comp. St. 1901, p. 3205]).

But, as broad as are the foregoing stated rights, neither can the company by any system, or irrevocable contracts, or force, or intimidation, require a man to continue his employment.   It did not take a constitutional amendment nor an act of Congress to make either slavery or peonage indefensible in morals.   And our laws, both state and national, upon the subject of peace, good order, good citizenship, a regard for the rights of others, the right of contract, as well as good morals, deny the right of all men to coerce by force, violence, or intimidation, or require a company or person to employ certain parties; and when one is employed, whether union or nonunion, he has the right to work in peace and quiet.   A man who does not belong to a union has the same rights, legal and moral, neither more nor less, as has a man who does belong to a union. His rights and his family are just as dear to him as are those of a union man.   There are and can be no differences.   And the company has precisely the same rights to employ nonunion men as union men, and the absolute legal and moral right to have its rights and property and its employés protected when it does elect for any reason to employ nonunion men; and when such rights are violated the company has the right to seek and obtain an injunction against the repetition of such violations.   All the courts, English and American, federal and state, so hold.   These questions are not debatable.

And yet, plain as are all the foregoing, if they had been recognized, this case would not have been brought.   Not only so, but there would not have been the slightest occasion for bringing this case, had there been any sincerity and honesty of purpose by the local authorities to maintain peace and order.   Intimidation, force, violence, and brutality were all winked at, because of the belief on the part of certain peace officers that they would be kindly remembered on future election days, instead of remembering that the great majority of the people of the city are law-abiding, and would reward those who would maintain peace and preserve order, to say nothing of the peace of mind arising from duty performed.   The evidence shows that the parties in the employ of the company have been assaulted by the strikers for no offense, for no wrong, for no crime, but solely because they elected to work under terms mutually satisfactory.   The accused stoutly deny any complicity. Employés have been denounced and called "scabs," and the most vulgar and profane names applied to them, for the sole reason that they elected to work, when work was offered to them of a satisfac-

tory character and at a price agreeable. The accused deny any complicity; but the proofs tend to show some of them guilty.

But as to one phase of the case there is no denial, but practically a confession, with the alleged and boasted right to practice it. A system of "pickets," for more than a year, around and near by places to the shops of the company, has been kept up by all the accused and others. The pretense of this picketing is the right to converse with the new employés and persuade them to quit, and the further pretense that they desire to see who are at work. This picketing is done by details of pickets, assigned by others; they taking turn. At all hours when men are going to and from work, morning, noon, and evening, the workmen must go through and by pickets, sometimes two, four, six, and more, at a place. At times the paths and walks are obstructed. At times the pickets are near by, making grimaces, and at times acting as if violence were intended, and at times uttering profanity and vulgarity. There is and can be no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching. When men want to converse or persuade, they do not organize a picket line. When they only want to see who are at work, they go and see, and then leave, and disturb no one physically or mentally. But such picketing as is displayed in the case at bar by the evidence does, and is intended to, annoy and intimidate. The argument seems to be that anything short of physical violence is lawful. One man can be intimidated only when knocked down. But the peaceful, law-abiding man can be and is intimidated by gesticulations, by menaces, by being called harsh names, and by being followed, or compelled to pass by men known to be unfriendly. Perhaps such a man may not be a bully, but is frail in size and strength, or he may be a timid man; but such a man is just as much entitled to go and come in quiet, without even mental disturbance, as has the man afraid of no one and able with or without weapons to cope with all comers. The frail man, or the man who shuns disturbances, or the timid man, must be protected, and the company has the right to employ such.

The test of manhood, and the rights of man or property, is not to be measured by braggarts or bullies, or vulgarity, or profanity, and the saloons must not be the place where supposed rights are to be decreed, as the evidence in this case shows has been attempted many times by some of those on the strike. The evidence shows that many of the men out on the strike are peaceable and law-abiding men, who recognize all that I have said, and who have sought and obtained honorable employment, some in other lines of employment in the city, and some elsewhere; but several prefer the course of staying about engaged in the so-called picketing, by which they mean to harass, provoke, and intimidate those who prefer work to idleness, and those who prefer the shop to the doggeries. This is done by some who give their time to intimidating hotel and boarding house keepers for boarding the workingmen. Such law-breaking is to the great injury of the workingmen and to the company; and such law-breaking must be broken up, else our laws are

without force, and our courts and all in authority serve no useful purpose.

The accused were solemnly warned by the writ of this court June 1, 1904. Two of the defendants appeared in person, but without counsel. None of the other defendants appeared, although notified. Those two were admonished by the court, which they kindly received and thanked the presiding judge. They have gone to work for other parties. The four now accused did not appear, but claim that they were advised by the two who did appear that picketing was not only lawful, but would receive the approval of the court. I need only repeat what I said at the hearing, that no such sentiments were ever at any time or place uttered. Such defense is puerile. The one answer is that such statements are hearsay. Another answer is that no one could or should believe that laboring men should be "picketed," as have the employés of the company for more than a year. Another answer, and with which all lawyers and laymen will agree, that if the restraining order was too drastic, a motion to modify it would have been entertained, and if too radical would have been modified.

May 6, 1904, these accused defendants and many others were enjoined from conspiring against the company and its employés, and from doing many things, some of which were as follows, viz:

"From threatening by the means of force or violence, or threats thereof, or by the use of opprobrious epithets or means of intimidation, whether upon or near the premises of said complainant or elsewhere, the employés hired and employed by said complainant in its machine shops, roundhouses, repair shops, or in its mechanical department, for the purpose of or with the design of intimidating such employés, or forcing them, or any of them, by such means to quit the service of said complainant; from inducing any employé of said complainant who may have a definite or fixed contract of employment with said complainant for a definite period, and particularly those employed by said complainant to take the places of strikers in its shops, roundhouses, or in its mechanical department, to break his or their contracts of employment with said complainant by leaving the employment of said complainant before the termination thereof; from conspiring, confederating, or combining, among themselves or with other parties, to do or accomplish any of the foregoing acts, or to cause the same to be done or accomplished, or to obstruct or impede said complainant, its agents or employés, in the carrying on of interstate commerce by said complainant, or in the discharge of the duties which it owes to the public or to the government of the United States, or to induce or solicit any other party or parties to do or attempt to accomplish, singly or in connection with any of said defendants, any of the foregoing acts hereby or heretofore sought to be restrained or enjoined."

The defendants each claim by affidavits, and by his own testimony, that at no time was he lacking in respect to the court, or its orders, and that he thought from what he was doing, and the supposed views of the court orally expressed, as carried to him by hearsay, that he was doing nothing to subject him to punishment for contempt. All of which is no answer at all. All that can be claimed for it is a mitigation of punishment. This court has no desire to be severe in its punishments, and particularly to those badly advised. But this court has a concern that peace and quiet prevail, and that a state of serfdom shall not exist, by a so-called system of "picketing" of one crowd of men over another. No self-respecting man will submit to it. Nor is he compelled to submit

to it. Nor does he have to resort to force to get rid of it. He need only apply to the courts, state or federal, and he will be given an order to end it. And when such orders are given they must be and will be enforced, and aid will be given by all peace officers who take their oath of office with any purpose to observe it, and, if need be, the entire powers of both the state and federal government will enforce obedience to such orders of the courts.

Upon all these matters, all the courts, state and federal, are agreed, as can be seen from the cases collected in the opinion of R. R. v. Ruef (C. C.) 120 Fed. 102–105. And just cause of complaint cannot be made by the issuance of the writ of injunction, for the reasons eloquently stated by Justice Brewer in his lecture on "The Triumphs of Justice," that it is much better, much kinder, more humane, to enjoin the commission of acts which amount to crime, than for those in authority to remain quiet until the acts are done, and then punish for crime, often ensnaring the ignorant and those driven to crime by others who have no concern, except to show the authority of the nonresident boss.

A copy of this will be sent to each of the accused, and this memorandum filed in the case, to the end that the views of this court will not be peddled out by hearsay, but that all who have an interest in the matter can know what will be regarded as the law of the case, until the restraining order is modified, either by this court on motion or by an appellate court on appeal. When it is convenient for me to be at Keokuk, or when the necessities require, judgment will be pronounced. Possibly the accused by that time can make it appear to the court by their conduct that there are other extenuating circumstances, or it may then appear that they deserve a real and substantial punishment. In large part, the conduct of the accused and their associates will determine all this.