[S. F. No. 14228. In Bank.—January 29, 1935.]

P. M. LISSE et al., Respondents, v. LOCAL UNION No. 31, COOKS, WAITERS AND WAITRESSES (an Unincorporated Association), et al., Appellants.

Walter M. Gleason and J. L. Royle for Appellants.

Henry B. Lister, as *Amicus Curiae* on Behalf of Appellants.

J. W. O'Neill for Respondents.

Brobeck, Phleger & Harrison and George O. Bahrs, as *Amici Curiae* on Behalf of Respondents.

THE COURT.—A hearing was granted in this case after decision by the District Court of Appeal, First Appellate District, Division One. Upon further consideration, we are satisfied that the opinion of that court correctly determines the issues, and we adopt it as our own opinion. It reads as follows:

"Plaintiffs own and operate a business in Oakland known as the Rainbow Cafe, wherein they manufacture and sell bakery products and serve meals to the public for profit; and as such owners they brought this action and obtained a judgment against the defendant labor union and some of its officers and members to restrain them from an alleged illegal interference with the operation of said business. From said judgment defendants appeal.

"The findings upon which the judgment is based follow generally the allegations of the complaint, and the evidence is legally sufficient to support such findings. Among the facts found were the following: 'That plaintiffs have conducted said business at said location continuously since 1924. That at all times up to the 8th day of October, 1929, plaintiffs in the conduct of said business, employed as cooks and waitresses, persons who were members of said defendant association. That on October 8, 1929, said defendant association called a strike against plaintiffs and at said time all of said cooks and waitresses, members of defendant association, as aforesaid, left their work at plaintiffs' said place

of business and ever since said date defendants have been and are now maintaining a boycott against plaintiffs' said business. That on the 11th day of October, 1929, defendants commenced to maintain and up to the time of the issuance of the temporary restraining order herein on November 27, 1929, did maintain, and, unless restrained by the court from so doing, will continue to maintain pickets in front of and adjacent to and near plaintiffs' said place of business for the purpose of intimidating and causing the public to cease to patronize the said business of plaintiffs. That since said 11th day of October, 1929, up to the time of the issuance of said restraining order, as aforesaid, said pickets so stationed in front of and adjacent to and near plaintiffs' said place of business, as aforesaid displayed and waved in front of the people passing by or approaching said place of business, papers on which are printed in large type the following statements: "RAINBOW CAFE NOW NON-UNION"; "IS ON OFFICIAL '"WE DON'T PATRONIZE"' LIST OF UNION LABOR"; "IS RAINBOW CAFE VIOLATING LAW?" "RAINBOW CAFE OWNER CHARGED WITH STATE EIGHT HOUR LAW VIOLATION"; "RAINBOW CAFE FIGHT PROGRESSES". That at the time of the commencement of this action, said pickets were displaying to and waving in front of the people passing by or approaching said place of business, papers on which are printed in large type the following statement: "RAINBOW CAFE FIGHT PROGRESSES" . . . . That at various times during said period from October 11, 1929, up to the time of the issuance of said temporary restraining order, as aforesaid, said pickets so employed by defendant association, as aforesaid, danced around on the sidewalk in front of plaintiffs' said restaurant, pointed at said restaurant and the persons therein, made grimaces and insulting gestures to and at the employees of plaintiffs, advanced near the door and prominently displayed to patrons in said restaurant said headlines derogatory to said restaurant, wildly waved said papers carrying said headlines against said restaurant, and displayed said papers by holding one spread across the chest of the picket so that said headlines against said restaurant could be plainly read by persons passing along the sidewalk in front of said restaurant or entering or leaving said restaurant and

by prominently waving and displaying another copy of said paper in the hand of the picket. That solely by reason of the maintaining of said pickets, as aforesaid, and the acts of said pickets as hereinbefore set forth, many persons who were regular patrons and customers of plaintiffs have been intimidated and caused and induced to cease and have ceased to patronize plaintiffs' said business.' The court further found as follows: '. . . that the newspapers displayed by said pickets, as aforesaid, with the headlines referred to said restaurant, as aforesaid, were copies of the East Bay Labor Journal and that said paper has been declared a newspaper of general circulation by decree of the Superior Court of the State of California, in and for the County of Alameda. But in this connection, the court finds that said newspapers were not displayed or offered for sale by said pickets in good faith or in the usual and ordinary manner, or for producing revenue or increasing circulation; that said newspapers were displayed by said pickets, as aforesaid, solely for the purpose of injuring and damaging plaintiffs and their said business and that defendants, pursuant to their said plan and conspiracy to injure and damage plaintiffs, procured and caused said headlines against said restaurant to be printed in bold type in said newspaper so that the same could be displayed in front of and near said restaurant of plaintiffs and at the same time assert the claim that said pickets were merely vendors of newspapers; that said claim of defendants that said pickets were *bona fide* newspaper vendors is a sham and subterfuge resorted to merely in an endeavor to cover up and conceal their real purpose, namely, to injure and damage plaintiffs. . . . '

The foregoing findings are legally sufficient under the decisions of this state to justify the granting of injunctive relief. (*Southern Cal. Iron & Steel Co.* v. *Amalgamated Assn.*, 186 Cal. 604 [200 Pac. 1, 4]; *Pierce* v. *Stablemen's Union* 156 Cal. 70 [103 Pac. 324]; *Goldberg, Bowen & Co.* v. *Stablemen's Union*, 149 Cal. 429 [86 Pac. 806, 117 Am. St. Rep. 149, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460]; *Rosenberg* v. *Retail Clerks' Assn.*, 39 Cal. App. 67 [177 Pac. 864, 865]; *Moore* v. *Cooks etc. Union*, 39 Cal. App. 538 [179 Pac. 417].)

"Appellants contend that even though the representatives stationed by them in front of respondents' cafe are deemed

to be pickets, they were at most engaged in 'peaceful picketing', which they claim, in the absence of any prohibitory state statutes or municipal ordinances upon the subject, may not be enjoined. It is evident, however, that the acts found to have been committed went beyond the bounds of peaceful picketing and amounted to physical intimidation of respondents' employees and patrons; and it is well settled by the decisions above cited that such acts will be enjoined. (See, also, 15 Cal. Jur. 581, and cases there cited.) ▮
In this regard it is held that in order to prove physical intimidation and fear it is not necessary to show that there was actual force or express threats of physical violence used, that such result may be accomplished as effectually by obstructing and annoying others and by insult and menacing attitude as by physical assault. (*Southern Cal. Co.* v. *Amalgamated Assn., supra; Jordahl* v. *Hayda,* 1 Cal. App. 696 [82 Pac. 1079] ; Martin on Labor Unions, p. 229.) In so holding the Supreme Court in the case of *Southern Cal. Co.* v. *Amalgamated Assn., supra,* in quoting approvingly from another case [*Allis-Chalmers Co.* v. *Iron Molders Union,* 150 Fed. 155, 173], said that 'intimidation includes persuasion by or on behalf of a combination of persons, resulting in coercion of the will from the mere force of numbers'; and the court then points out that the same rule is declared in Martin on Labor Unions, *supra,* as follows : 'Even a simple "request" to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimation, with a design to hinder or obstruct workmen, is unlawful intimidation, and not less obnoxious than the use of physical force for the same purpose.' The rule is applied with equal force as to customers and patrons. (*Goldberg, Bowen & Co.* v. *Stablemen's Union, supra.*)

▮ "With respect to the display of the labor journal in front of respondents' place of business by appellants' representatives, it is of course true that the constitutional guarantee against abridgement of the freedom of the press carries with it freedom of circulation and sale of the publication (*Ex parte Jackson,* 96 U. S. 727 [24 L. Ed. 877]), and obviously the fact that a newspaper may support and advocate the cause of a trades union in a controversy with an employer, and uses its columns and headlines to bring

to the attention of the public the claim of the union that the particular business in question is being operated in a manner deemed unfair to labor, serves as no legal ground for interfering with the sale or circulation of such newspaper in the immediate vicinity of the place where such business is being carried on, or elsewhere. ▮ But it is held in the case of *Goldberg, Bowen & Co.* v. *Stablemen's Union, supra,* that it is an invasion of the constitutional right to acquire, possess and enjoy property, to place pickets in front of a place of business bearing placards and signs for the purpose of intimidating the patrons or employees of such place of business and that such acts will be enjoined; and in the present case the trial court found as already shown that the display of said journal in front of respondents' place of business was not in good faith for the purpose of circulating or selling the same, and that said journal was not offered for sale in the usual and ordinary manner by newspaper vendors, but was displayed by appellants' pickets as a sham and subterfuge for the purpose of intimidating the patrons and employees of said place of business. It is evident, therefore, that the facts of appellants' representatives in displaying said journal in front of respondents' place of business in the manner and for the purposes found were brought within the rule of the Goldberg case, *supra,* prohibiting the illegal display of signs and placards.

▮ "The injunctive relief granted, however, was, in our opinion, too broad, for the reason that not only do the terms thereof go so far as to infringe upon the constitutional right to freely circulate and offer said newspaper for sale upon the public streets, but under the law of this state, in the absence of contractual obligations, a trades union, besides having the right to call a strike, has the legal right also to carry on in connection therewith a boycott, both primary and secondary; and it is evident that the comprehensive terms of the injunction herein enjoin appellants from doing some of the acts which under the decisions of this state they may lawfully do in furtherance of a secondary boycott. As said in *Pierce* v. *Stablemen's Union, supra* (p. 75): 'The right of united labor to strike, in furtherance of trade interests (no contractual obligation standing in the way) is fully recognized. The reason for the strike may be based upon the refusal to comply with the employees' de-

mand for the betterment of wages, conditions, hours of labor, in the discharge of one employee, or the engagement of another—in brief, in any one or more of the multifarious considerations which in good faith may be believed to tend toward the advancement of the employees. After striking, the employees may engage in a boycott, as that word is here employed. As here employed it means not only the right to the concerted withdrawal of social and business intercourse, but the right by all legitimate means—of fair publication, and fair oral or written persuasion, to induce others interested in or sympathetic with their cause, to withdraw their social intercourse and business patronage from the employer. They may go even further than this, and request of another that he withdraw his patronage from the employer, and may use the *moral* intimidation and coercion of threatening a like boycott against him if he refuse so to do. This last proposition necessarily involves the bringing into a labor dispute between A and B, C, who has no difference with either. It contemplates that C, upon the request of B, and under the moral intimidation lest B boycott him, may thus be constrained to withdraw his patronage from A, with whom he has no controversy. This is the "secondary boycott", the legality of which is vigorously denied by the English courts, the federal courts, and by the courts of many of the states of this nation. Without presenting the authorities, which are multitudinous, suffice it to state the other view in the language of the President of the United States but recently uttered: " . . . [The language referred to is here quoted.]'' And continuing, the court said: 'Notwithstanding the great dignity which attaches to an utterance such as this, which, as has been said, is but the expression of numerous courts upon the subject-matter, this court, after great deliberation, took what it believed to be the truer and more advanced ground above indicated and fully set forth in *Parkinson* v. *Building Trades Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550]. ▮ In this respect the court recognizes no substantial distinction between the so-called primary and secondary boycott. Each rests upon the right of the union to withdraw its patronage from its employer and to induce by fair means any and all other persons to do the same, and in exercise of those means, as the unions would have the

unquestioned right to withhold their patronage from a third person who continued to deal with their employer, so they have the unquestioned right to notify such third person that they will withdraw their patronage if he continues so to deal. However opposed to the weight of federal authority the views of this court are, that they are not unique may be noted by reading *National Protective Association* v. *Cumming,* 170 N. Y. 315 [68 N. E. 369, 88 Am. St. Rep. 648, 58 L. R. A. 135]; *Lindsay* v. *Montana Federation of Labor,* 37 Mont. 264 [96 Pac. 127, 127 Am. St. Rep. 722, 18 L. R. A. (N. S.) 707]; where the highest courts of those states formulate and adopt like principles.' Upon the same subject, and with particular reference to the right of striking employees to induce fellow employees to join in such strike the Supreme Court in the case of *Southern Cal. Co.* v. *Amalgamated Assn., supra,* said: 'Furthermore, it is lawful for the employee who has quit to peaceably persuade a fellow-employee to leave his position. Moreover, if there are a number of employees who have left a common employer, they are within their legal rights if and when they attempt as a group to persuade other employees, who continue to work, to quit, provided there be no force, violence, or intimidation, physical or moral, used—that is, the mere fact of numbers does not necessarily make such persuasion illegal.'

''In the present case the broad terms of the injunctive relief granted are doubtless based upon an abstract statement contained in the decisions in the cases of *Rosenberg* v. *Retail Clerks' Assn., supra,* and *Moore* v. *Cooks etc. Union, supra,* to the effect that 'there is no such thing as peaceful picketing'. However, the decision in neither of those cases was reviewed by the Supreme Court on petition for hearing before that court, and an examination of the decisions themselves will disclose that the statement referred to was founded on certain language used in the decision in *Atchison, T. & S. F. Ry. Co.* v. *Gee,* 139 Fed. 582, which, as will be noted, was a federal case, and not only did it involve acts of actual violence, but as pointed out by the Supreme Court in *Pierce* v. *Stablemen's Union, supra,* the legality of the secondary boycott, in furtherance of which acts of picketing are carried on, is 'vigorously denied' in the federal jurisdiction. True, in the Pierce case, the court goes

on to say that picketing in its very nature is calculated to and naturally does incite crowds, riots, and disturbances of the peace; but the argument used was evidently intended to apply to such facts as were then before the court, which showed that the pickets actually used menacing terms and threatening language, such as: ' . . . This is a scab stable. When we catch you outside, we will finish you. We will get you yet. It is a scab stable, full of scabs. We will fix you yet. It is a matter of time when we will get you all right. You will never get out of the stable alive. We will break you in half. We will beat you to death. When we catch you outside, we will finish you.' ▆▆ As further indication that the court in that case did not intend to hold in the abstract that there could be no such thing as peaceful picketing, we quote the following from its opinion: 'As we have undertaken to define boycott, it is an organized effort to persuade or coerce, which may be legal or illegal, according to the means employed. In other jurisdictions where a definition is given to a boycott which imports illegality the injunction will of course lie against boycotting as such. *In this state the injunction will issue, depending upon the circumstances whether the means employed, or threatened to be employed, are legal or illegal'* (italics ours), which is in accord with the general rule declared in Ruling Case Law (vol. 10, p. 454) wherein it is stated that the decision of the question whether picketing is lawful or unlawful depends upon the circumstances surrounding each case; that taking every circumstance into account, if it appears that the object of the picketing is to interfere with those passing in or out by other than persuasive means, it is illegal; but that if the design of the picketing is to see who can be the subject of persuasive inducement, such picketing is legal, and that whether picketing is lawful or unlawful depends in each particular case upon the conduct of the parties themselves. And the concurring opinion of Justices Angellotti and Sloss, in the Pierce case, *supra,* may be taken also as indication of a belief on the part of the court in that case that all forms of picketing are not inherently unlawful, for it is there said: 'So far as "picketing" is concerned, while we are not prepared to hold that there may not be acts coming within that term as it is accepted and understood in labor disputes, that are entirely lawful and should

not be enjoined, we believe that as to such "picketing" as is described in both findings and judgment in this case, the views expressed in the opinion of the court are correct.' It will be noted, too, from an inspection of the opinion in the Pierce case, *supra,* that in order to conform to the views therein expressed upon the subject of secondary boycott the terms of the injunction were modified, the court in this regard saying: 'It was, for example, too broad in restraining defendants from "in any wise interfering with" plaintiff's business, since the interference which we have discussed, of publication, reasonable persuasion, and threat to withdraw patronage, is legal and such as defendants could employ. So, also, was the injunction too broad in restraining defendants from "intimidating any customer by boycott or threat of boycott" since, as has been said, the secondary boycott is likewise a legal weapon.' So, also, in the case of *Southern Cal. Co.* v. *Amalgamated Assn., supra,* the injunction was modified to exclude from its operation a certain form of picketing, the court there saying: 'The judgment as entered, however, is too broad in its terms, in that it purports to prohibit acts which may or may not be unlawful, according to the purpose for which they are done, and it does not clearly couple the acts with the unlawful purpose. Thus, for example, the placing of pickets near respondent's place of business for a purpose not at all connected with said business and not for the purpose of intimidating employees of respondent, so as to coerce them to quit that employment, nor for the purpose of intimidating persons intending to become employees of respondent, so as to prevent them from doing so, could not appropriately be enjoined, since such an act would not be wrongful as against the respondent and would not be calculated to injure the respondent's business.' But as already shown, in that case, as in the present one, physical intimidation and fear was used in carrying on the secondary boycott; in other words, there, as here, in order to accomplish a legitimate object appellants rosorted to illegitimate means; consequently those illegal acts were enjoined.

"Therefore, in order to conform as far as possible with the views expressed in the cases above cited, and to follow the form of the judgment as modified in *Southern Cal. Co.* v. *Amalgamated Assn., supra,* it is ordered that the judg-

ment herein be modified and re-entered to read as follows: 'It is therefore ordered, adjudged and decreed that defendants herein and each of them and all persons acting for them or either of them or in aid or assistance of them or either of them be and they are hereby perpetually enjoined and commanded to desist and refrain directly or indirectly or by any means or method from doing or attempting to do any of the following described acts: (a) intimidating, threatening, molesting or coercing plaintiffs in the conduct of their business known as the "Rainbow Cafe" situated at No. 1218 Broadway Street, in the city of Oakland, California, or for any such purposes obstructing or interfering with, or attempting to obstruct or interfere with the free use, occupation and enjoyment thereof by plaintiffs, their agents, servants and employees; (b) intimidating, threatening molesting or coercing any employee or employees, customer or customers, patron or patrons, of plaintiffs; (c) stationing or placing any picket or pickets with the intention or for the purpose of intimidating, threatening, molesting or coercing, or attempting to intimidate, threaten, molest or coerce any customer, patron or employee or plaintiffs now or hereafter patronizing or working for said plaintiffs. It is further ordered, adjudged and decreed that the plaintiffs do have and recover from defendants their costs of suit, taxed herein at the sum of $44.50.'

"In reviewing cases of this kind and in framing the terms of injunctive relief it is, of course, as said in many of the decisions, impossible to define comprehensively or with exactness each and every act which may or may not be legally done in carrying on a labor controversy; and it is evident that any attempt so to do would lead into a field of unlimited speculation. All that the court can do is to deal with those specific acts which by the evidence are shown to have been committed in furtherance of the particular dispute then before it; and necessarily the question of whether future acts of a different character, if any there be, shall be deemed to fall within the inhibitive provisions of the judgment must be left, primarily at least, to the decision of the trial court in determining any subsequent proceedings based thereon."

As hereinabove modified the judgment will stand affirmed, respondents to recover their costs.