[Crim. No. 511. Fourth Appellate District.—June 24, 1938.]

In the Matter of the Application of FRANK LYONS, for a Writ of Habeas Corpus.

W. C. Dorris and R. W. Henderson for Petitioner.

Victor H. Parry for Respondent.

MARKS, J.—Frank Lyons filed his petition in this court seeking release from confinement under an order finding him guilty of contempt of court and committing him to jail for a period of five days.

Clyde W. Rowlinson and Wayne Odom were copartners in a grocery store and vegetable market in or near the city of Bakersfield in Kern County, California. They conducted their business under the name "Riverview Drive In Market".

They operated their store themselves except with the help of one occasional employee who worked about thirty hours a week. They rented space in their market to Bernard A. Daly and John F. Daly who conducted a retail meat market without the aid of any employees.

The Amalgamated Meat Cutters and Butcher Workmen of North America, Local No. 193, is an unincorporated association known as a labor union, as is the Retail Clerks' International Protective Association, Local No. 137. G. Harold Woodard is secretary of the Butchers Local, and Wm. H. Bailey is the business Agent of the Retail Clerks Local.

■ Neither Rowlinson and Odom nor Daly and Daly had any agreement with organized labor. They had no dispute nor difference with organized labor concerning wages, hours or conditions of employment, unionization of employees, employing nonunion labor or any other matter that usually gives rise to labor troubles or differences. The only controversy was over the closing of their places of business on Sunday. In this respect this case is unique in American Jurisprudence in so far as we are advised by counsel or can ourselves ascertain. We have found no case where a retail business establishment was picketed by a labor union representative to force Sunday closing.

Rowlinson and Odom and Daly and Daly kept their places of business open seven days a week. In January, 1938, they were approached by Woodard and Bailey as representatives of the two labor unions who requested them to close their places of business and to sign a contract to keep them closed from 12 o'clock midnight on each Saturday night to 12 midnight on each Sunday night. The shopkeepers refused to sign the agreement but did keep their places of business closed for four consecutive Sundays to test the practicability of such Sunday closing. They opened their shops for business at about 7:30 o'clock on the morning of Sunday, February 27, 1938. At about 10 o'clock a picket, or pickets, appeared bearing placards upon which appeared the words, "Unfair", "Unfair to Organized Labor", and "Unfair to Organized Labor, Local # 193". On and after March 3, 1938, pickets daily paced back and forth on the sidewalk bearing similar placards. There is no showing that the pickets did or said anything to anybody other than to silently bear the placards. They did not attempt to otherwise interfere with the shop-

keepers, their businesses or customers or with anyone entering or leaving the premises. We are not informed of the number of persons engaged in the picketing except from the use of the plural, "pickets". Whether this is intended to mean more than one picket acting at the same time, or a relay of one picket following another on the same day, we do not know. It at least appears that on April 5, 1938, petitioner Frank Lyons was picketing alone.

On March 18, 1938, the shopkeepers filed an action in the Superior Court of Kern County seeking to enjoin the two unions, their officers, agents, employees and members (sued as John Does and Richard Roes) from continuing the picketing and to recover $607.50 actual, and $10,000 punitive damages. It is alleged that the grocery and vegetable business fell off $150 per week and the meat business $52.50 per week as a result of the picketing.

An order to show cause was issued and on April 2, 1938, a temporary restraining order was made restraining the picketing. As we have observed, petitioner was picketing on April 5, 1938. The restraining order was served on him. He refused to desist, was cited for contempt of court, found guilty of contempt and sentenced to confinement in the county jail for five days. This proceeding followed. There is no intimation that his action caused any disturbance or that he did anything other than what is known as "peaceful picketing".

There appear to be no Sunday closing or antipicketing ordinances in either Kern County or in the city of Bakersfield. There is no Sunday closing or antipicketing statute of the state of California applicable to the parties to this controversy. This case is simply one in which a group of citizens attempted to force the shopkeepers to close their places of business on Sundays. That the group composed the membership of two labor unions is unimportant. Union members have no greater right to attempt to force a place of business to close on Sunday than has any other group of citizens and at the same time no less right. We must measure the rights of the respective parties to the Sunday closing controversy by general principles, and in so far as the cases dealing with picketing in labor disputes announce those general principles, they are applicable here.

The plaintiffs in the injunction action base their hopes of success on those provisions of the federal and state Constitutions granting to every citizen the right to acquire, possess and enjoy property, and guaranteeing to him the equal protection of the laws of the land. (Amendments V and XIV to the U. S. Const.; secs. 1, 13 and 21, art. I, California Const.) Petitioner bases his right, to peacefully picket, on the provisions of the First and Fourteenth Amendments to the Federal Constitution and on section 9 of article I of the state Constitution which guarantee the unrestricted right of free speech. Thus we have here a recurrence, in a somewhat novel form, of that struggle between property rights and personal rights which has occupied the attention of the courts of the land since the organization of the Republic. The courts have always been zealous to protect the rights of persons to acquire, own and enjoy property. They have been more zealous, if possible, to protect the personal right of free speech, and perhaps justly so, for free discussion contains the germ of progress which keeps flowing the blood stream of the Republic.

The rules governing these two rights are summarized in American Jurisprudence, pages 1108, 1109, 1117, as follows:

''The people have protected not only their persons from unreasonable treatment by governmental authority by virtue of the Bill of Rights, but also their property. By virtue of the Fifth Amendment to the Federal Constitution and the provisions of the various state Constitutions, it was early provided that the Federal, state, and local governments could not take private property for public use without just compensation. This power is further governed as to both the Federal and state authority by the provisions of the Fifth and Fourteenth Amendments to the United States Constitution, as well as the provisions of the various state Constitutions, that no person shall be deprived of his property without due process of law. . . .

''The Constitution of the United States and the Bill of Rights of many of the states contain prohibitions against the enactment of laws which would abridge the freedom of speech or of the press. . . . By virtue of later decisions of the Supreme Court, the rule has become firmly settled that the right of freedom of speech and of the press, which is protected by the First Amendment from abridgement by

Congress, is among the fundamental rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the states. . . .

"Not only is the freedom of speech and of the press protected from infringement by the legislative department, but it is also safeguarded from judicial abridgement. An essential element of the liberty of the press is its freedom from all censorship over what shall be published and exemption from control, in advance, as to what shall appear in print. Consequently, it has been asserted that the right of freedom of speech and the press cannot coexist with the idea of preventing such freedom of speech or of the press by injunction. Thus, the right to boycott has been asserted under the constitutional guaranty of freedom of speech and of the press, and an instance is given where the authority to enjoin persons from exercising freedom of speech peaceably in assistance of a boycott has been vigorously denied." (See, *Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550]; *Dailey* v. *Superior Court*, 112 Cal. 94 [44 Pac. 458, 53 Am. St. Rep. 160, 32 L. R. A. 273].)

The cause of the plaintiffs in the injunction case must of necessity rest on the following reasoning: There is no law or ordinance prohibiting them from keeping their places of business open on Sunday. It was therefore their legal right to do so. In so doing they were entitled to the free use of their own property and the uninterrupted trade of their customers. The good will of their business was a part of their property which they were entitled to enjoy (secs. 992, 993, Civ. Code) and which is protected by constitutional guaranties. Good will has been defined "to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities or prejudices. (Story on Part., Sec. 99.) . . . According to Lord Eldon it is the probability that the old customers will resort to the old place. It is the probability that the business will continue in the

future as in the past, adding to the profits of the concern and contributing to the means of meeting its engagements as they come in." (*Bell* v. *Ellis,* 33 Cal. 620.) The actions of petitioner in picketing the places of business of the shopkeepers was for the purpose of compelling them to cease exercising their lawful right of doing business on Sunday. It interfered with their property right of having their customers do business with them freely. It caused them substantial and continued loss by injuring the good will of their business. It amounted to "an obstruction to the free use of property so as to interfere with the comfortable enjoyment of . . . property" (sec. 3479, Civ. Code) which constituted a nuisance. As the shopkeepers alone were damaged it constituted a private nuisance. (Sec. 3481, Civ. Code.) It was a continuing private nuisance. A continuing private nuisance that causes continuing damage to property may be enjoined. (Secs. 526, 731, Code Civ. Proc.) As defendants in the injunction action were guilty of maintaining a continuing private nuisance the trial court was fully justified in enjoining them. As petitioner knowingly violated the terms of the restraining order he was guilty of contempt of court and was properly punished for his contempt. Therefore, he should be remanded to custody.

The foregoing arguments might be persuasive had not the courts of California established and clearly defined the right to peacefully picket a place of business in the case of a labor dispute, as generally understood, and the right to conduct a boycott and a secondary boycott. In view of those rules the foregoing arguments entirely lose their force and cannot be sustained. Of course we have here no labor dispute as that term is generally understood. However, we cannot conclude that fact sufficient to distinguish the cases in principle. In California there is no statute either prohibiting or permitting peaceful picketing, under the circumstances here involved, as is now the case in some jurisdictions. (See, *Senn* v. *Tile Layers Protective Union, Local No. 5,* 222 Wis. 383 [268 N. W. 270, 872] ; *Senn* v. *Tile Layers Protective Union, Local No. 5,* 301 U. S. 468 [57 Sup. Ct. 857, 81 L. Ed. 1229] ; *Lanf* v. *E. G. Shinner & Co., Inc.,* 303 U. S. 323, 58 Sup. Ct. 578 [82 L. Ed. 872].)

In this state the right to peacefully picket rests upon the constitutional guaranty of the right of free speech. We

cannot see how the right to peacefully picket, under the guaranty of free speech, could be confined to cases in which there exists a dispute between an employer and organized labor over hours or conditions of employment, rate of pay, unionization of employees or employment of nonunion men and not extended to a dispute between a business man and any citizen or group of citizens who may differ with him on a question of business policy. The guaranty of the right of free speech is general and extends to every class or group of citizens. As that guaranty is not confined to labor organizations, decisions in those cases announcing the principles upon which the right rests in the cases involving the ordinary labor dispute are important and controlling here. Because we have a difference of opinion on the question of closing a mercantile establishment on Sunday as the cause of the peaceful picketing, that fact should not make the rules announced in those decisions any less applicable. Citizens have just as much and no less right to differ on the wisdom of Sunday closing as they have to entertain different opinions on conditions of employment or rates of pay. The exact method used in conveying these opinions to the public is unimportant provided they are peacefully and quietly done in an orderly manner and not in violation of the provisions of a statute or an ordinance. As was said in *Dailey* v. *Superior Court, supra:*

"It is immaterial whether the words be publicly spoken from the stage or upon the hustings, or out to the world through the channels of the printing press. By the constitutional provision we are about to invoke a citizen may speak, write, or publish his sentiments with equal freedom, . . . "

It is settled in California that an action will not lie in favor of one contracting party against a third party who through bad motives, or otherwise, induces another contracting party to breach the contract where it is not one establishing the relation of master and servant and where the person causing the contract to be broken uses no fraud, threats, violence, falsehood or deception and receives no benefit to himself. (*Boyson* v. *Thorn*, 98 Cal. 578 [33 Pac. 492, 21 L. R. A. 233].) In other words in California, "a bad motive does not convert an act otherwise lawful into a ground of action". (*Parkinson Co.* v. *Building Trades*

*Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550], per Beatty C. J., p. 594.)

From the evidence before us it is clear that the unions sought to force the shopkeepers to close their places of business on Sunday by means of what has been termed a secondary boycott, that is, by attempting to induce by arguments (not by threats, coercion or intimidation), their patrons to transfer their business to other merchants.

The legality of a secondary boycott, peacefully conducted and without picketing, was sustained in the case of *Parkinson Co.* v. *Building Trades Council, supra.* In the concurring opinion of Mr. Justice Sloss, in this portion of which three other justices concurred, it was said:

"The injunction then, must rest upon the principle that it is unlawful, in an effort to compel A to yield a legitimate benefit to B, for B to demand that C withdraw his patronage from A, under the penalty of losing B's services or patronage, to which he has no contract right. That there are many cases sustaining the affirmative of this proposition is true. (Citing cases.)

"So there are many cases to the contrary. (Citing cases.) . . .

"Upon a consideration of the authorities I think the sounder rule is that one who is under no contract relation to another may freely and without question withdraw from business relations with that other. This includes the right to cease to deal, not only with one person but with others; not only with the individual who may be pursuing a course deemed detrimental to another who opposes it, but with all who by their patronage aid in the maintenance of the objectionable policies. In other words, if the defendants violated no right of the Parkinson Company by refusing to work for it, they violated none by refusing to work for contractors who used material bought of Parkinson. Such refusal, as is shown in the opinion of the Chief Justice, and as is stated in the testimony of plaintiff's manager and principal witness, was the 'sum total of the interference' which was practiced or threatened. . . . I see no reason why workmen have not the same absolute right to dispose of their labor as they see fit. So long as they abstain from breach of contract, violence, duress, menace, fraud, misrepresentation, or other unlawful means, they may lawfully inflict such damage

as results from the witholding of their labor or patronage. To quote again from Judge Holmes's opinion in *Vegelahn* v. *Guntner*, 167 Mass. 92 [57 Am. St. Rep. 443, 35 L. R. A. 722, 44 N. E. 1077], 'If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that when combined they have the same liberty that combined capital has to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control.'

"The terms 'intimidation' and 'coercion', so frequently used in the discussion of this question, seem to me to have no application to such acts as were here committed. One cannot be said to be 'intimidated' or 'coerced', in the sense of unlawful compulsion, by being induced to forego business relations with A, rather than lose the benefit of more profitable relations with B. It is equally beside the question to speak of 'threats', where that which is threatened is only what the party has a legal right to do."

We next turn to the case of *Jordahl* v. *Hayda*, 1 Cal. App. 696 [82 Pac. 1079], in which the defendants picketed plaintiff's restaurant, the pickets carrying a banner on which was printed, "Boycott—Fairwind Restaurant, declared an unfair restaurant by Cooks and Waiters' Alliance, Local No. 220. Public is asked not to patronize the place." The trial court found on sufficient evidence that defendants had threatened and intimidated plaintiff's patrons and thus kept his trade away. The trial court enjoined defendants "from stationing themselves in the doorway of said restaurant or upon the sidewalk in front of the same and there interfering with the business of plaintiff by intimidation, insults, or threats to his patrons, thereby inducing persons not to patronize the restaurant of said plaintiff; and said defendants, . . . are hereby especially enjoined from in any manner interfering with the said business of plaintiff by means of threats or intimidation of any kind or nature, directed against the patrons or customers . . . of said plaintiff and from interfering by means of threats or intimidation with any person that may be working for plaintiff or may desire to work for him in his said restaurant." This judgment was affirmed

on appeal. It was not even contended that the carrying of the banner was in itself, and standing alone, unlawful.

The Jordahl case was cited with approval and quoted from in the case of *Southern California etc. Co.* v. *Amalgamated Assn. etc. Workers,* 186 Cal. 604 [200 Pac. 1], which was a picketing case in which there was evidence of threats of violence and of intimidation. In deciding the case the Supreme Court said:

"From the foregoing authorities these principles may be deduced: In the absence of contract, the right of a workman to quit his employment is as absolute as the right of a fellow-employee to remain in the employment, or of another workman to take the place vacated by the one who has quit, or the right of the employer to dispense with an employee's services. Furthermore, it is lawful for the employee who has quit to peaceably persuade a fellow-employee to leave his position. Moreover, if there are a number of employees who have left a common employer, they are within their legal rights if and when they attempt as a group to persuade other employees, who continue to work, to quit, provided there be no force, violence, or intimidation, physical or moral, used— that is, the mere fact of numbers does not necessarily make such persuasion illegal. But where violence, threats, or intimidation are used in an effort to induce another to quit his employment, then the acts of an individual or a number of individuals are unlawful and may be enjoined. However, it is not necessary to the enjoining of such acts, that it be shown there was actual force or expressed threats of physical violence used. It was said in *Allis-Chalmers Co.* v. *Iron Molders Union,* 150 Fed. 155, 173, that 'intimidation includes persuasion by or on behalf of a combination of persons, resulting in coercion of the will from the mere force of numbers). The same rule is thus stated in Martin on Labor Unions, *supra:* 'Even a simple "request" to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimation, with a design to hinder or obstruct workmen, is unlawful intimidation, and not less obnoxious than the use of physical force for the same purpose.' . . .

"The judgment as entered, however, is too broad in its terms, in that it purports to prohibit acts which may or may not be unlawful, according to the purpose for which they are

done, and it does not clearly couple the acts with the unlawful purpose. Thus, for example, the placing of pickets near respondent's place of business for a purpose not at all connected with said business and not for the purpose of intimidating employees of respondent, so as to coerce them to quit that employment, nor for the purpose of intimidating persons intending to become employees of respondent, so as to prevent them from doing so, could not appropriately be enjoined, since such an act would not be wrongful as against the respondent and would not be calculated to injure the respondent's business.''

The judgment was modified so as to enjoin defendants from intimidating or coercing plaintiff's employees or those seeking employment. The portion of the judgment restraining defendants from hindering, in any manner set forth, plaintiff's business was stricken out. As modified, the judgment was affirmed.

The case that must be controlling here is *Lisse* v. *Local Union No. 31, Cooks, Waiters, etc.*, 2 Cal. (2d) 312 [41 Pac. (2d) 314]. In that case there was picketing and the display of headlines of newspapers in an effort to divert customers from the plaintiff's cafe. The Supreme Court modified the restraining order issued by the trial court so that it permitted peaceful picketing and only enjoined acts of intimidation and coercion. In connection with the display of newspaper headlines used in connection with the boycott, it was said:

''With respect to the display of the labor journal in front of respondent's place of business by appellants' representatives, it is of course true that the constitutional guarantee against abridgement of the freedom of the press carries with it freedom of circulation and sale of the publication (*Ex parte Jackson*, 96 U. S. 727 [24 L. Ed. 877], and obviously the fact that a newspaper may support and advocate the cause of a trades union in a controversy with an employer, and uses its columns and headlines to bring to the attention of the public the claim of the union that the particular business in question is being operated in a manner deemed unfair to labor, serves as no legal ground for interfering with the sale or circulation of such newspaper in the immediate vicinity of the place where such business is carried on, or elsewhere. But it is held in the case of *Goldberg, Bowen & Co.* v. *Stable-*

*men's Union,* 149 Cal. 429 [86 Pac. 806, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460], that it is an invasion of the constitutional right to acquire, possess and enjoy property, to place pickets in front of a place of business bearing placards and signs for the purpose of intimidating the patrons or employees of such place of business and that such acts will be enjoined; and in the present case the trial court found as already shown that the display of said journal in front of respondents' place of business was not in good faith for the purpose of circulating or selling the same, and that said journal was not offered for sale in the usual and ordinary manner by newspaper vendors, but was displayed by appellants' pickets as a sham and subterfuge for the purpose of intimidating the patrons and employees of said place of business. It is evident, therefore, that the facts of appellants' representatives in displaying said journal in front of respondents' place of business in the manner and for the purposes found were brought within the rule of the Goldberg case, *supra,* prohibiting the illegal display of signs and placards.

''The injunctive relief granted, however, was, in our opinion, too broad, for the reason that not only do the terms thereof go so far as to infringe upon the constitutional right to freely circulate and offer said newspaper for sale upon the public streets, but under the law of this state, in the absence of contractual obligations, a trades union, besides having the right to call a strike, has the legal right also to carry on in connection therewith a boycott, both primary and secondary; and it is evident that the comprehensive terms of the injunction herein enjoin appellants from doing some of the acts which under the decisions of this state they may lawfully do in furtherance of a secondary boycott. As said in *Pierce* v. *Stablemen's Union,* 156 Cal. 70, p. 75 [103 Pac. 324] : 'The right of united labor to strike, in furtherance of trade interests (no contractual obligation standing in the way) is fully recognized. The reason for the strike may be based upon the refusal to comply with the employees' demand for the betterment of wages, conditions, hours of labor, in the discharge of one employee, or the engagement of another—in brief, in any one or more of the multifarious considerations which in good faith may be believed to tend toward the advancement of the employees. After striking, the em-

ployees may engage in a boycott, as that word is here employed. As here employed it means not only the right to the concerted withdrawal of social and business intercourse, but the right by all legitimate means—of fair publication, and fair oral or written persuasion, to induce others interested in or sympathetic with their cause, to withdraw their social intercourse and business patronage from the employer. . . . ' ''

We can find no sound legal distinction between attempting to enforce a secondary boycott by means of peacefully displaying a newspaper headline and peacefully conveying similar information on a banner or in letters which were the means of communication used by the defendants in *Parkinson Co.* v. *Building Trades Council, supra.*

Respondents rely upon the cases of *Goldberg, Bowen & Co.* v. *Stablemen's Union, supra, Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324], *Rosenberg* v. *Retail Clerks' Assn.,* 39 Cal. App. 67 [177 Pac. 864], and *Moore* v. *Cooks, Waiters etc. Union, No. 402,* 39 Cal. App. 538 [179 Pac. 417].

Each of these cases involved picketing to enforce a secondary boycott. In the first three there were acts of the pickets that amounted to coercion, threats, menace and intimidation. The Moore case rests largely upon the theory, announced by the court, that ''there is, and can be, no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching''. The same thought runs through the other three cases although in each of them it clearly appears that the picketing was far from peaceful. That being the case those expressions were clearly *dicta.* Those expressions in the Rosenberg and Moore cases were expressly disapproved in *Lisse* v. *Local Union No. 31, supra.* In the same case the Goldberg etc. Company and the Pierce decisions were limited in effect to their facts which show clearly that the picketing was not peaceful. Therefore, the four cases upon which respondents rely cannot be considered controlling here because in three of them there were threats and coercion by the pickets which is not present in the instant case, and the reasons on which the fourth decision rests have been expressly disapproved by the Supreme Court.

In the instant case there was but one picket active on the day on which the alleged contempt was committed. The ac-

tions of that picket were peaceful in every respect. His only fault was in carrying the banner we have mentioned. He did not address any of the shopkeepers or any one of their customers. It is true that the sign he carried did induce certain customers to withhold their trade from the shopkeepers. The legal effect of petitioner's actions was to enforce a secondary boycott. As we have seen, a secondary boycott peacefully and properly conducted is legal in California under the constitutional guaranty of the right of free speech. It is now too late for us to question such right. In a Republic it is necessary that the rights of freedom of speech and freedom of the press be zealously guarded by the courts. Those rights form the life stream of liberty. History teaches us that when those rights are suspended, the right to possess and enjoy private property rapidly vanishes.

The following rule is announced in *Berger* v. *Superior Court*, 175 Cal. 719 [167 Pac. 143, 15 A. L. R. 373]:

"It is thoroughly settled in this state that the affidavit by which a contempt proceeding is instituted, in order to sufficiently support an adjudication of contempt, must state facts constituting the offense. It is the complaint in such a case, and if defective in that respect, the adjudication cannot stand."

(See, also, *McClatchy* v. *Superior Court*, 119 Cal. 413 [51 Pac. 696, 39 L. R. A. 691]; *In re Lake*, 65 Cal. App. 420 [224 Pac. 126].) The complaint in the injunction suit and the affidavit charging the contempt charged only peaceful picketing in aid of a secondary boycott which is legal in California. It follows that as neither the complaint nor the affidavit charged the commission of an act that could be enjoined petitioner must be discharged.

Before closing this opinion we should again call attention to the fact that no statute or ordinance prohibiting or regulating picketing is here involved. What may be the right under the police powers of the state, or any of its political subdivisions, to prohibit or regulate the use of public streets or sidewalks for picketing is not before us and is not decided.

Petitioner is discharged and his bail exonerated.

Barnard, P. J., concurred.

HAINES, J., *pro tem.*, Concurring.—I concur for the reason that the case appears to me to be controlled by the authority of *Lisse* v. *Local Union No. 31, Cooks, Waiters, etc.*, 2 Cal. (2d) 312 [41 Pac. (2d) 314].